```
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                         OAKLAND DIVISION

 3

 4   UNITED STATES OF AMERICA,     )  Case No.  18-mj-71386-MAG
                                   )
 5              Plaintiff,         )  Oakland, California
                                   )  Monday, October 15, 2018
 6        vs.                      )
                                   )
 7   COLE EVAN WHITE,              )
                                   )
 8              Defendant.         )
     _____)
 9

10    TRANSCRIPT OF CONTINUED DETENTION HEARING AND REMOVAL HEARING
                 BEFORE THE HONORABLE KANDIS A. WESTMORE
11                  UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13
     For Plaintiff:            PHILIP J. KEARNEY, JR., ESQ.
14                             U.S. Attorney's Office
                               Organized Crime Strike Force
15                             450 Golden Gate Avenue, 11th Floor
                               San Francisco, California 94102
16                             (415) 436-6758

17   For Defendant:            DAVID J. COHEN, ESQ.
                               Bay Area Criminal Lawyers, PC
18                             300 Montgomery Street, Suite  660
                               San Francisco, California 94104
19                             (415) 398-3900

20   Pretrial Services Officer:   BETTY KIM

21   Transcription Service:     Peggy Schuerger
                                 Ad Hoc Reporting
22                               2220 Otay Lakes Road
                                 Suite 502-85
23                               Chula Vista, California 91915
                                 (619) 236-9325

24

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
```

2

1    OAKLAND, CALIFORNIA  MONDAY, OCTOBER 15, 2018  9:53 A.M.

2                           --oOo--

3         THE CLERK:  Calling 18-71386, USA v. Cole White.

4      (Pause.)

5         MR. KEARNEY:  Your Honor, good morning.  Philip Kearney

6    for the United States.

7         THE COURT:  Good morning, Your Honor.

8         MR. COHEN:  Good morning, Your Honor.  David Cohen on

9    behalf of Mr. White, who's present in custody.

10        THE COURT:  And good morning, Mr. Cohen.  Good morning,

11   Mr. White.

12        MR. WHITE:  Good morning.

13        THE COURT:  Okay.  So we're back on in this matter for

14   a continued detention hearing.  I know that we were also going to

15   -- at least I was last informed we were going to have an

16   identity/removal hearing?

17        MR. COHEN:  Yes, Your Honor.  With regard to the latter,

18   I've had a chance to speak to my client at length over the weekend

19   and to review all the information that I obtained late last week,

20   including the FBI 302.  And at this point, Mr. Cole is prepared --

21   I'm sorry -- Mr. White is prepared to waive an identity hearing.

22        THE COURT:  Oh, okay.  So then I will have him removed

23   to the Western District of Virginia.  And then there's the matter

24   of the continued detention hearing.  I will just sort of reiterate

25   that there was a full bail report prepared by Pretrial Services,

1    and in that report Pretrial Services recommends that the Defendant

2    be detained as a danger to the community.

3         So why don't we start with you, Mr. Cohen.

4              MR. COHEN:  I certainly can start.  I do believe that --

5    well, I do believe that if the Government is going to make --

6    because the Government has the burden of showing danger to the

7    community by clear and convincing evidence, it would be the

8    Government that would make the proffer and I would rebut it.

9    But --

10             THE COURT:  That's fine, if you would like the

11   Government to go first.

12             MR. COHEN:  Well, if the Government wishes to -- if the

13   Government wishes to incorporate the report, I could -- basically,

14   I have a lot of information, so I can certainly go.  I don't think

15   it makes that much difference.

16             THE COURT:  I just only asked you since you're going to

17   be directly opposing --

18             MR. COHEN:  All right.

19             THE COURT:  -- Pretrial Services' recommendation.

20             MR. COHEN:  Let me start and --

21             THE COURT:  Okay.

22             MR. COHEN:  -- and I'm sure Mr. Kearney will have a lot

23   to say on the Government's side.

24             THE COURT:  Okay.

25             MR. COHEN:  That's been my experience with Mr. Kearney

1  in the past.

2      So Pretrial Services -- the Pretrial Services report, in our

3  view, is in error in a number of ways.  And I start off by

4  pointing out that Pretrial Services is not saying that no

5  conditions or combination of conditions could be set to -- that

6  would assure Mr. White's appearance.  So with regards to flight

7  risk, which is the preponderance of the evidence standard for the

8  Government, Pretrial Services, looking at page five of the report,

9  in the first paragraph, "Assessment of non-appearance danger,"

10  Pretrial Services concludes that, "These risks of non-appearance

11  can be reasonably mitigated through a combination of strict

12  release conditions."

13          THE COURT:  Right.  And if you look at the

14  recommendation, the recommendation is that he be detained based on

15  danger.

16          MR. COHEN:  Exactly.  But I -- I understand that.

17          THE COURT:  Okay.

18          MR. COHEN:  But I'm saying that as to the flight risk

19  piece of it, Pretrial Services is agreeing that conditions could

20  be set.  As to the danger component, Pretrial Services says, "On

21  balance, there's information here that shows that no combination

22  of conditions could be set that would assure the safety of the

23  community."

24      I'm going to go through the factors in both paragraphs just

25  because they are related to one another, in my view.

1          THE COURT:  Okay.

2          MR. COHEN:  First of all, on the issue of not locating

3    the passport is easily disposed of in the sense that we have

4    located the passport.  It was in Mr. Cole's (sic) dad's house.

5    Mr. -- his name is Rick White, and Mr. White found the passport

6    and we have turned it in and surrendered it to Pretrial Services.

7    We did that on Friday.

8          THE COURT:  Okay.

9          MR. COHEN:  Looking at the paragraph relating to flight

10   risk, the Pretrial Services speaks about a risk -- I'm sorry --

11   "international familial ties" in the second line.  Mr. White does

12   not have any family overseas.  He has no international familial

13   ties.  So we're simply not sure what this -- to what this refers.

14        The FBI 302, which we've gone through in detail, does not

15   discuss any international familial ties.  I note, Your Honor, that

16   the FBI 302 was at least audio-taped.  It may have been

17   videotaped.  It's unclear which.  But it was at least audio-taped,

18   and the audio tape has not been produced to the Defense.  We

19   request it.  And we request the audio and/or video.

20        The summary that we have is not -- does not have a number of

21   points that were made, which I'm going to get to, by Mr. White

22   during the course of his interview two weeks ago.

23        With regard to the international -- so, again, because he

24   didn't ever say that he had international familial ties, and we're

25   not aware of any, there's nothing really more that we can say on

1    that other than that's not correct.

2              THE COURT:  Okay.

3              MR. COHEN:  His international travel history.  So the

4    FBI 302 talks about three different trips.  And let's just step

5    back for a moment and remember that Mr. White is 24 years old.  He

6    is a college student at S.F. State.  He was going to DVC earlier,

7    which is Diablo Valley College in Contra Costa County.

8         And he has no prior record.  And Pretrial Services correctly

9    concludes that he has no issues relating to mental health and he

10   has no substance abuse issue.

11        He traveled the first time -- he has three trips

12   internationally in his entire life.  He traveled the first time

13   between September 6th, 2014 and December 5th, 2014 and this was

14   international study abroad.  Mr. White is interested in

15   hospitality and tourism.  That's the career that he's interested

16   in going into.  That's what he's majoring in at S.F. State. He's

17   a senior there -- on 19th Avenue.  And the study abroad was

18   successful during this particular period.

19        He could not -- although there were times during the -- on

20   the weekends that he would travel in other parts of Europe, as

21   students do -- I did it when I was in Europe in college.  Many,

22   many students -- my kids did it.  It's not unusual for students to

23   go to Europe during college and travel and go to different cities

24   for tourism, which is what Mr. White did.

25        There was not meeting during that period with any improper

1  person.

2      The second trip was from September 20th, 2016 through October

3  10th, 2016.   Mr. White  traveled  to  Europe.   He went  through

4  Iceland and visited Paris, Budapest, Prague, and Dublin.  This was

5  a trip for his own tourism.  It was not a trip having anything to

6  do with anything improper.

7      The third time that he traveled to Europe was from July 19th,

8  2017 to July 30th, 2017.  He flew through Iceland and he continued

9  to Dublin, Belfast, Edinburgh, Liverpool, Manchester, and went

10  back to Dublin.  Again, this was a trip for tourism.  There was

11  nothing improper during the course of this trip.

12      So when Pretrial Services cites this international travel

13  history, there's nothing about his international travel history

14  that -- that should show that he's a flight risk or a danger to

15  the community.  And, of course, his passport has now been turned

16  in.  I don't think anybody is taking the position that Mr. White

17  has somehow these resources or contacts where without a passport,

18  he can somehow fly around or move around the world when other than

19  these three times that he was out of the country, he's been a

20  resident of Contra Costa County.  He lives with his dad.  He's

21  lived with his dad the last three to five years.  He was in his

22  childhood home for approximately 23 and a half of those years.

23  The parents have recently divorced and they sold the childhood

24  home and now he is living with his dad in a different place in

25  Clayton, very close to where he lives at home.  That's where he's

1    been his entire life.

2              THE COURT:  Uh-huh.

3              MR. COHEN:   Now, there's a -- an allegation in the

4    flight risk section of the report that says that Mr. -- Mr. White,

5    who's here, Rick White, does not, in the opinion of Pretrial

6    Services, hold the "moral suasion" over Mr. White to act as

7    custodian or ensure that he doesn't act out or do something

8    improper while bond is posted.

9         We deny that.  Mr. White, if he were called to testify, would

10   explain that he's lived with his son for his entire life and he

11   has been with him essentially over the last three, to four, five

12   years without any break.  They speak on a regular basis.  He would

13   testify that Mr. White is essentially a homebody.  He doesn't go

14   out.  He doesn't drink.  Mr. White is not aware of any issues

15   relating to his violence for misbehavior.  Mr. White would have no

16   problem enforcing any type of curfew that the Court would set,

17   would have no problem making sure that any type of ankle monitor

18   that this Court would order would be installed and/or wouldn't

19   have any problem.  There is certainly a land line at the house and

20   all that stuff.

21        So he's here.  He's been here at every court appearance.  And

22   Pretrial Services at no time said to Mr. White, Do you think that

23   you have the moral suasion to control your son?  They didn't ask

24   him that.  They didn't even talk to him about that.

25        What Pretrial Services is citing here, and also in the danger

1   section, are the alleged weapons that were found during the course

2   of the search warrant that was executed on Rick White's house two

3   weeks ago which -- early in the morning, and of course Cole White

4   was present.

5        The Government has brought some color pictures of these

6   alleged weapons and I'm going to go through them in turn.

7             THE COURT:  Is there a copy for me?

8             MR. KEARNEY:  There is.  Just for the record, these are

9   Government Exhibits 1 through 10.

10            THE COURT:  Okay.

11            MR. KEARNEY:  And, Your Honor, if I may -- Counsel, I

12  don't mean to interrupt -- I was going to give the Court a factual

13  background of these interviews.  Perhaps I could just do that

14  briefly.

15       Images 1 through 2, Your Honor, --

16            THE COURT:  Okay.

17            MR. KEARNEY:  -- are evening photographs taken at a tiki

18  torch march the night before the "Unite the Right" rally, what is

19  the subject of the indictment.  So the tiki torch rally was on

20  August the 11th, 2017 in Charlottesville, and the next set of

21  images, 3 through 6 -- they're all marked for the Court -- are

22  from the "Unite the Right" rally the following day, which is

23  August the 12th of 2017.

24            THE COURT:  Three through -- you said 3 through 6?

25            MR. KEARNEY:  Three through 6, yes.

1          THE COURT:  Okay.

2          MR. KEARNEY:  And then 8 through 9 -- or 3 through 7.

3    Eight through 9 are weapons that were retrieved from his home on

4    October the 2nd of this year, about ten days ago -- two weeks ago.

5       And if the Court needs further explanation of any of those

6    photographs, I'm happy to give that.

7          THE COURT:  What's 11?

8          MR. KEARNEY:  Those are the improvised devices, Your

9    Honor.

10          THE COURT:  Oh, okay.

11          MR. KEARNEY:  Those are -- those were taken from his

12    car.  They are -- the Government believes -- the first one, the

13    top most one in that image -- this is the two small devices the

14    Court's looking at; is that correct?

15          THE COURT:  Uh-huh.  Yes.

16          MR. KEARNEY:  That is a metal spike placed inside of a

17    piece of PVC pipe.  The FBI tells me they are used to enhance a

18    person's punching ability and cause more damage.

19       And the lower one in that image -- and these were both taken

20    from his car -- is a razor --

21          THE COURT:  It looks like a box cutter or something.

22          MR. KEARNEY:  It's a razor inserted in another piece of

23    pipe.

24          THE COURT:  Uh-huh.

25          MR. KEARNEY:  Making it more -- more able to be held by

1    an assailant.

2              THE COURT:  Okay.

3              MR. KEARNEY:  The machete was taken from underneath Mr.

4    White's mattress.   And then the -- the knife with the Nazi

5    insignia was taken from I believe his closet.

6              THE COURT:  Okay.  And so, Mr. Cohen, you were about to

7    refer to the Exhibit 8 and -- 8 through 11?

8              MR.  COHEN:   Yeah.   The ones that I have are not

9    numbered.  Is the machete Exhibit 8?

10             THE COURT:  Yes.

11             MR. COHEN:  And --

12             THE COURT:  Nine is the knife with the swastika on it.

13             MR. COHEN:  Nine is the knife.  Ten is the baton.

14             THE COURT:  Baton.  And then 11 is the --

15             MR. COHEN:  Eleven is the combination of the corkscrew-

16   like item and the razor blade?

17             THE COURT:  Right.

18             MR. COHEN:  Okay.  So I'd like to, in a counterproffer,

19   explain what these items are.

20             THE COURT:  Okay.

21             MR. COHEN:  The machete was obtained many years ago by

22   we believe one of Mr. White's parents.  Jackie White is his mom.

23   She's also here in court, together with, as the Court can see,

24   many other parts of the family.

25             THE COURT:  Uh-huh.

1          MR. COHEN:  Ms. Garcia, who's his grandmother, is once
2   again here and I'm going to get to her on the properties, but
3   she's once again here and is willing to post whatever properties
4   and equity is necessary to assure Mr. White's appearance and that
5   he does not violate any conditions of release.
6       In any event, while Jackie and Rick White are not sure
7   exactly when the machete was purchased, the belief is it was at a
8   flea market many years ago and Mr. White has had this weapon,
9   which we don't believe is a weapon -- this item -- for that period
10  -- for a long period of time during his life, from when he was a
11  little child.
12      He used it to cut grass and clear brush outside of the
13  childhood home.  It's a dull -- it's a dull blade and when they --
14  the childhood home was sold recently and they moved to the new
15  address, Mr. White moved with it and he put it under the mattress.
16  There is nothing nefarious about where he put it.  That's just
17  where he put it.
18      The second item, Number 9, the Court can even see how dull
19  this item is.  It was -- it's not an item that is -- it looks more
20  like a collector's item and is certainly not an item that even by
21  looking at it -- and if we were to bring it, if the Court could --
22  the Court could see, it's just a dull blade.  It's not something
23  that is dangerous.  It's something that Mr. White purchased as a
24  souvenir when he was in Budapest during -- during his travels.
25  And he brought it in.  It was shown to Customs.  And Customs

1   approved it.  And he's had it since that time.  It was in the

2   closet.

3       The baton/asp is an item that Mr. White purchased after the

4   rally at Berkeley.  Now, that's gonna come up a little bit later

5   in my counterproffer, but essentially there were two rallies that

6   Mr. White attended.  He never attended Huntington Beach.  He never

7   attended any other rallies in the United States or Europe or

8   anywhere else.  In his entire life, he's been to two rallies --

9   one in Berkeley in or about April of 2017 and one in

10  Charlottesville in or about August of 2017.  And Mr. Kearney's

11  correct -- that the Charlottesville component included the 11th of

12  August where there was the torch march through UVA and then on the

13  12th was the -- the "Unite the Right" rally which was in front of

14  the statute in Charlottesville.

15      That's where -- that's where he's been.  And after he was at

16  the rally in Berkeley, which he did not attend having -- knowing

17  anybody there.  He just -- he was interested in -- he heard about

18  it.  He was interested in going there and he went there.  He met

19  Mr. Daley for the first time there.  He doesn't know the other two

20  defendants that are in this indictment, never has met them.  He

21  doesn't know them.  And the FBI, to the extent that they indicate

22  that in their 302, the tape would show otherwise.  He made it

23  really clear that he didn't know Mr. Miselis or anybody else.  He

24  and Mr. Daley -- he spoke to Mr. Daley, as the FBI 302 indicates,

25  on a very sporadic basis, from April to August of 2012 and a

1    little bit -- I'm sorry -- 2017 and a little bit thereafter.  They

2    were completely innocuous messages, spoke to him by Instagram.

3    And so -- but after the Berkeley incident -- the Berkeley rally,

4    there were pictures of Mr. White that were taken that were on

5    social media, that were online.  And he worked at that time in

6    Berkeley, at a -- at a food -- kind of fast food/hot dog type of

7    place.  And by the end of August, he was fired because so many

8    people complained on Yelp about the Charlottesville issue.  But he

9    was still working there after Berkeley in April.

10         And there were threats that were made to him online.  There

11   were people that followed him on the streets in Berkeley that

12   threatened him while he was going to and from work.  And this was

13   between April and -- and August of 2017.

14         So Mr. White did obtain this item, which is in Exhibit 10,

15   for self-defense.  He's never used it in his life.  It's not an

16   unlawful item under state law or federal law.

17         Moving on to the -- the items that are depicted in

18   Government's Exhibit 11, the corkscrew-like item is used by Mr.

19   White for skateboarding and for snowboarding.  That's what he uses

20   it for.  He's a skateboarder and he's a snowboarder and he's an

21   avid -- he's avid as to both of them.  He's a 24-year-old young

22   man.  So that's what that's for and that's what was in his car.

23              THE COURT:  Okay.

24              MR. COHEN:  After Mr. White was fired from his job in

25   Berkeley, after all the Yelp complaints, after the Charlottesville

1  rally in late August 2017, Mr. White was able, after a period of

2  time, to get another job and he worked -- he's not sure if he has

3  this job anymore, given everything that has happened -- but he

4  works -- or he did work, until the day of his arrest -- at a -- at

5  a place called Go-Runner in San Francisco.  Go-Runner is a food

6  delivery service.  And many of the items that are delivered are --

7  are to Asian -- Asian-type items which have a lot of sauces, have

8  a lot of stews, that kind of thing.

9           THE COURT:  Uh-huh.

10           MR. COHEN:  What -- so he would drive from Clayton and

11  he'd go to work in San Francisco and he would deliver for Go-

12  Runner on a Vespa.  So in the back of the Vespa, there would be

13  this little basket and it would bounce around and the stews or the

14  sauces, they would splash if they were not tied up in a way that

15  was appropriate.

16        And so what Mr. White did was he would tape up -- he would

17  tape up -- he would be given boxes by Go-Runner and he would tape

18  these boxes up real tight.  Then when he got to the customers and

19  he delivered the items, he would use the items -- the razor blade

20  item, makeshift item in Exhibit 11, to cut the tape so that he

21  could deliver the food.  That's what that was for and that's why

22  it was in his car.

23        Excuse me.

24        (Pause.)

25        Now, moving on to Pretrial Services paragraph two, which

1    incorporates some of the earlier statements that are made in the

2    Pretrial Services report, Pretrial Services refers to "the nature

3    of the instant offense" and I'm going to start off with -- with

4    that.

5         In Charlottesville, there is no allegation that on the night

6    of the torch march on August 11th, 2017, that Mr. White did

7    anything untoward or improper.  I get the fact that there's a

8    picture here -- it might be Government's Exhibit 1 -- of Mr. White

9    marching and holding a torch.  But, you know, he's not doing

10   anything wrong by holding a torch and walking.

11        And, in fact, Mr. White was stabbed by somebody we believe

12   was an Antifa person, but we're not sure -- one of the

13   counterprotesters -- on that night.  And he was stabbed on his arm

14   and he realized that after the fact.  And he told the FBI that.

15   And that part of the tape -- and like I said, we don't have the

16   tape -- but that part of what he told the FBI isn't in the report.

17   It's not in the summary report.

18        When he got to the -- how did he get to Charlottesville?  How

19   did the whole thing happen?  Well, he had been in sporadic contact

20   with Mr. Daley.  Mr. Daley was not conspiring with Mr. White to do

21   anything particularly with Mr. White.  But at one -- at some

22   point, Mr. Daley advised Mr. White of the fact that there would be

23   this rally in Charlottesville.  And, again, Mr. White and Mr.

24   Daley had met at the rally in Berkeley.

25        Mr. White was interested in attending the rally and, frankly,

1   Mr. White believed that some of the political opinions that "Unite
2   to Right" espoused were opinions that had merit, and so he wanted
3   to go there and show solidarity.

4        He paid for his own plane ticket to go there.  He thought he
5   was going to be reimbursed by the group based upon what Mr. Daley
6   said, but he was never reimbursed.  He told the FBI this.  It's on
7   the tape, we believe.  We don't see it in the -- in the 302.

8        So he did make the statement afterwards to the FBI that, yes,
9   he expected that it was gonna be a pretty intense event, that the
10  fact was is that as intense as Berkeley might have been, this was
11  going to be -- it was a planned event, it was known that there
12  were going to be maybe four thousand people.  Charlottesville is
13  a relatively small town and it was going to be an intense event.

14       He did say that there was adrenaline that, you know, was
15  involved, you know, obviously because there were -- there were
16  people of one political belief marching and there were people on
17  the other political belief protesting and there would be
18  adrenaline involved.  I mean, he admits that.  He knows that.  I
19  mean, anybody who says that's not the case, that would not be
20  accurate.  Of course, that -- I mean, the media spoke for days
21  about this upcoming event.  Everybody knew it was coming up.
22  Everybody knew that the "Unite the Right" people had a permit,
23  that they were going to march.  Everybody knew it was coming up.
24            THE COURT:  Uh-huh.
25            MR. COHEN:  So it's not that Mr. White somehow was alone

1  in this.  Everybody in the country knew it was coming up.  I mean,
2  that's what was being covered on all the -- all the cable stations
3  for days.

4      And by the way, there's a lot of people in this -- in Exhibit
5  1 that are -- that are depicted.  There's a lot of other people
6  that were carrying torches.  And there's thousands of people that
7  were in downtown Charlottesville during the actual protest on the
8  12th of August.

9      They're not all charged in federal court.  So the fact that
10  they all went there, the fact that they were all interested, the
11  fact that they all traveled there, that doesn't show that they all
12  conspired somehow to commit a crime.  Mr. White is being charged
13  with crossing state lines and crossing state lines for the
14  purposes of inciting a riot; in other words, that he somehow
15  conspired and planned to go there and incite a riot before he got
16  there.

17      There's no evidence whatsoever in anything the Government can
18  present that would support that particular assertion or theory.

19      In any event, on the day of the march -- I'm sorry -- of the
20  protest -- of the rally on August 12th -- actually, I'm sorry.
21  Let me get back to the -- to the tiki torch march.  So Mr. White
22  didn't know exactly -- he knew that he was going to meet Mr. Daley
23  there.  He flew into Charlottesville.  You can see in the pictures
24  that the Government has shown us that Mr. White had his backpack.
25  He went directly from the airport to a location -- to a place that

1   he was given that he was going to meet on a Friday night.  He

2   didn't know there was going to be a march on Friday night.

3        When he got there with his backpack, he was given a torch and

4   they all walked.  He learned of it when he got there.

5        The next day, when he appeared for the -- for the rally

6   which, again, was planned as a peaceful rally -- there was a

7   permit for it -- eventually and at some point, he was told to

8   march -- and this was by a person named Eli -- he said Eli told

9   him -- he had just met Eli there -- he said, Look, don't engage.

10  March two by two.  That's it.  Don't engage.

11       So that's what Mr. White did.

12       I've looked at whatever videos I can find that are on YouTube

13  and that are available.  There's a very -- the best video that I

14  could find, Your Honor, was a National Geographic presentation --

15  a documentary that was on August -- it was around April 16th or

16  17th of 2018.  And this National Geographic documentary shows a

17  lot of video of both the tiki torch march as well as of the rally

18  the next day.

19       The group that Mr. White was with was walking and the videos

20  clearly show that they were charged by a group of other

21  counterprotesters.   They were charged by the group of

22  counterprotesters, and these pictures that the Government is

23  presenting shows Mr. White and others pushing back, grabbing the

24  shoulders and pushing the other individuals back when they pushed

25  in there.

1    There was a point where Mr. White was grabbed and others were

2  grabbed by their arms so that he did not have the ability to use

3  his arms.  He -- it's clear from the videos that he used his head

4  in self-defense to head-butt two individuals one time each.  He

5  used his head to head-butt a person who the Government refers to

6  as a clergy person.

7         THE COURT:  Uh-huh.

8         MR. COHEN:  And that person eventually was pushed down

9  and fell down from the group.

10        THE COURT:  And the clergy person was attacking him?

11        MR. COHEN:  The clergy person is not clearly attacking

12 him, and he was part of a group of individuals that were rushing

13 the group.

14        THE COURT:  Uh-huh.

15        MR. COHEN:  And so it's not clear because -- and, again,

16 I can make this video available to the Court.  I have it.  I can

17 mark it as an exhibit if the Court is interested in reviewing it.

18        THE COURT:  Uh-huh.

19        MR. COHEN:  Obviously, it's a very confused situation

20 and it happened very, very fast, and I've looked at it several

21 different times.  But the best that I can see, it looks like a

22 group pushes in there.  They're all pushing back.  I believe that

23 the video, together with some of the other information that the

24 Government has presented, shows that Mr. White head-butted this

25 individual one time, and then eventually that person -- it's not

1   clear as a result of the head-butt or whatever -- but eventually

2   fell back from the group.

3        The second individual was a woman who Mr. White head-butted

4   one time and it's very clear, at least to me, that -- from the

5   video that to the extent that Mr. White head-butted this woman, he

6   did not cause her to bleed.  There was no blood on her at the time

7   of the second head-butt.

8        It is true that later on this same woman, when she pushed

9   back from the group, did have blood on her forehead.  It's also

10  true that this same woman ran back into the melee for more after

11  she was bleeding.

12       It's also true that this same woman interviewed with the NPR

13  representatives, with the press afterwards about what she was

14  doing as part of the counterprotesters.  She was an active

15  counterprotester and there isn't any doubt, looking at the video,

16  that the group that Mr. White was with was not attacking anybody

17  else.  They were the ones who were attacked.

18       So what we're looking at from the perspective of

19  Charlottesville is a 24-year-old man with all the -- with no

20  record, with no background, with no other threats, living with his

21  dad, working, went to this rally and two head-butts -- one, two --

22  while his hands are being held behind his back, when he was

23  stabbed the night before.  That's what we're talking about.

24            THE COURT:  His hands were held behind his back?

25            MR. COHEN:  He and the other people that they were with,

1 when they were rushed by the group, their hands were -- the way it

2 happened, they were marching two by two, the group rushed them,

3 and they were grabbed and their hands were behind their back.  The

4 nature of what happened was that they were rushed by people and

5 their hands were -- his hands at the time were being held back.

6          THE COURT:  The people who rushed him held his hands

7 behind his back?

8          MR. COHEN:  That's his belief.

9          THE COURT:  All right.

10          MR. COHEN:  Again, it happened fast, so that he -- his

11 hands were not free and other people that he was with, their hands

12 were not -- their arms were not free.  He -- because it happened

13 so fast, he can't say -- and it's not clear from the video --

14 exactly how his hands were pinioned, but they were -- which is why

15 he was head-butting.  That's why he was using his head.

16     So, you know, the idea that he was running across a sidewalk

17 or he was running across some -- some field and he ran into

18 somebody and head-butted them as an attack, that's just not what

19 this is.

20          THE COURT:  Uh-huh.

21          MR. COHEN:  Now, let's go back a few months to

22 Charlottesville because that's the -- I'm sorry -- to Berkeley

23 because that's the only other time that Mr. White attended any of

24 this stuff.  Again, the allegations in the indictment about the

25 van and the purchase of those tickets and, you know, going

1  together and reserving information and planning and getting an

2  Airbnb and all that stuff, Mr. White had no idea about any of that

3  stuff.  He wasn't part of any of that stuff.  I mean, whatever

4  these guys did in Los Angeles, that's what they did.  Mr. White

5  has no ties to any of the people in Los Angeles.

6      So let's go back to Berkeley, which was in April of 2017.  I

7  explained how Mr. White got there.  A young man who had some

8  interest in what was going on, like a lot of people that were

9  there, and he ended up in a situation where he was with a group of

10 people that were on one side and then there were Antifa

11 counterprotesters on the other side.

12     While he was there, he and his group were the recipients of

13 rocks, bricks, M-80s being thrown at them over a period of time.

14 There were two gentlemen that -- that looked directly at Mr. White

15 while they were throwing the bricks and while they were throwing

16 the other items at the direction of the group that he was in.

17     After about half an hour of this going on, they were

18 separated.  They were -- there was law enforcement there.  Again,

19 M-80s were being thrown.  There was something called CS gas, which

20 was being -- was emanating from the people on the other side of --

21 the counterprotesters.  Mr. White and the people that he was with

22 were trying to get away from the gas and also clear the area.

23 When they got close to the protesters on the other side, Mr. White

24 saw these same two guys who had been throwing the bricks, rocks at

25 him earlier -- looking right at him -- and one of them attacked

1   him and started punching him.  Mr. White punched back.  He punched

2   back.

3       And then the next guy, who he had seen -- who Mr. White had

4   seen earlier, grabbed Mr. White and Mr. White tackled that guy and

5   they were on the ground and Mr. White punched that guy.  The video

6   that's been released is a video that shows the first guy and then

7   there's a break.  It shows the first guy attacking him and then

8   there's a break and then the second -- this is not in the NPR --

9   this is not the -- this is not the -- did I say NPR?  The National

10  Geographic.

11       THE COURT:  You said National Geographic.

12       MR.  COHEN:    Yeah.    That's  correct  --  National

13  Geographic.  This video is on YouTube, the one from Berkeley.

14  It's not part of a documentary, not that I've found so far.  What

15  it looks like is is that Mr. White was attacked, he punches the

16  first guy.  Then there's a break.  Then there's -- it shows Mr.

17  White on the ground punches the second guy.

18       And that's -- what I just described, in terms of Berkeley in

19  April  and  Charlottesville  in  August,  is  the  sum  total  of

20  everything  that  Mr.  White  has  done  in  terms  of  physical

21  interactions with individuals.  That's the sum total of physical

22  interactions that Mr. White has been involved with, you know, for

23  the most part in his entire life except for one time that he was

24  -- there was an attempted robbery of him when he was in Paris on

25  the -- when he was studying abroad in Paris.  That's it.  That's

1  the sum total.

2       So the notion that given all of this -- given this

3  information, that Mr. White by clear and convincing evidence, who

4  is a danger to the community if he's released, seems a real

5  stretch.  I mean, if he were such a danger to the community, then

6  why was he not arrested after Berkeley when he was on video?  If

7  he was such a danger to the community, why was he not arrested

8  after Charlottesville when everybody saw him clearly in these

9  pictures for a long, long time?

10       And what's happened in this intervening time when he was such

11  a danger to the community?  He's gone to S.F. State and he's --

12  and he worked as a -- as a delivery person and he's a homebody

13  with his dad.  That's what he's done.

14       So the idea that by clear and convincing evidence that

15  keeping him out he's going to be a danger to the community makes

16  no sense.

17       Which gets us to this question of his international ties and

18  international travel that Pretrial Services talks about in the

19  second part of this paragraph where they say, "Several concerning

20  comments reported by the case agent and the Assistant United

21  States Attorney from the Western District of Virginia."

22       Those concerning comments are highlighted on page four of the

23  report.  "He has several international contacts with family

24  members."  I've already addressed that -- in England.  "And

25  associates through his study abroad program in France."

1    Well, it is true that when he went to France in a study
2 abroad program, he did meet some people and on his later trips on
3 one occasion, I think there was an advisor that he met in
4 Liverpool.  No assertion that this was untoward or this advisor
5 had something to do with some kind of improper group.

6    Let's talk about the marriage to the individual in the Czech
7 Republic and he's unsure of the validity of the marriage and he
8 referred to this individual as his ex-wife.

9         THE COURT:  Didn't he tell Pretrial Services he was
10 never married?

11         MR. COHEN:  He was never married, and this allegation by
12 the -- that's what I wanted to get to.  This allegation is just
13 not accurate.

14         THE COURT:  Okay.

15         MR. COHEN:  That's why I'm getting to it.

16         THE COURT:  Okay.

17         MR. COHEN:  So -- so what happened was Mr. -- the first
18 time that Mr. White was traveling, from September 6th through
19 December 5th study abroad, one of the weekends he went to Prague
20 just to visit.  He was at a square in Prague and he heard somebody
21 laughing, and it was a young woman, and her name is Evisek,
22 E-v-i-s-e-k.  And they hit it off and hung out for about six
23 hours.  And she joked about the fact -- she said, Well, you know,
24 I've always wanted to elope with an American guy.  And so Mr.
25 White thought about the idea of eloping with her but declined to

1    do it.   And when he got back to the United States, he told his

2    family,   Oh,   by   the   way,   I'm   married   to   this   person   from

3    Czechoslovakia.   This caused Jackie and Rick to become upset.

4        But he was kidding them.   He was just tweaking them.   And so

5    whenever   the   family   referred   to   Evisek   in   the   future,   they

6    referred to Evisek as Mr. White's ex-wife.

7        Mr. White, who's 24 years old, kind of when he's talking to

8    the FBI, he starts saying, Oh, there's this person that I met.

9    Her name is -- you know, I don't know if they even asked her name,

10   but he said, You know, it's my ex-wife and he was gonna explain it

11   to them, but then they went on to another subject.

12       And -- and it's true that he visited Evisek a second time on

13   the second trip, I believe -- is that correct?

14           MR. WHITE:   That's correct.

15           MR. COHEN:   On the second trip and that was the second

16   -- the second trip was the one from September 20th, 2016 to

17   October 10th, 2016.   On the second trip, he visited her for two

18   hours.   They got a drink together and that was it.   Their

19   communication was on Instagram.   He does not have her phone

20   number.   He does not have her email.

21       Looking at the bottom of the paragraph, the case agent

22   advised Pretrial Services that Mr. White allegedly head-butted

23   several individuals, causing the victims to bleed.   I went through

24   what we say occurred, that there were two individuals -- didn't

25   cause anybody to bleed.

Then Mr. Kavanaugh, the Assistant United States Attorney from the Western District of Virginia, advised that Mr. White allegedly reported "He traveled internationally with his own funds to Europe to meet with leaders of other groups similar in nature to RAM. The Defendant allegedly reported traveling to Europe to meet with leaders of the Alsar (ph) Aryan Alliance and the Scottish National Resistance.  In 2016 and 2017, Mr. Kavanaugh stated the Defendant allegedly traveled both domestically and internationally to commit acts of violence and he is an alleged associate or member of a white supremacist group that engages in violence."

Now, first of all, on the membership, the FBI 302 makes clear that even the FBI doesn't say that Mr. White is a member of any of these groups.  And there is no evidence whatsoever, other than the fact that he attended these rallies, that he is an associate or engages in meetings or planning with any of these groups.

This statement by Mr. Kavanaugh  -- "traveled both domestically and internationally to commit acts of violence" -- by an Assistant United States Attorney is an irresponsible statement. There is no evidence that Mr. -- other than what we just talked about -- that Mr. -- that Mr. White ever traveled even in the United States or internationally to commit acts of violence.

So those are the kinds of statements, when made by a prosecutor and are presented to a court in a Pretrial Services report, which we are able to see for the first time and not able to bring into court, which are unfortunate, Your Honor.

1    I'd like to address the first part of what Mr. Kavanaugh

2   said, which is that Mr. White traveled on these two occasions to

3   Europe to meet with leaders of the Alsar Aryan Alliance and the

4   Scottish National Resistance in 2016 and 2017.

5        Your Honor, may I get some water, please?

6             THE COURT:  Sure.

7        (Pause.)

8             MR. COHEN:  What this is based on, in looking into this,

9   is the following:  Mr. White posted on his Facebook a statement,

10  a so-called screed, but it was a statement.

11            THE COURT:  A screed?

12            MR. COHEN:  That's what they refer to it as.

13            THE COURT:  Okay.

14            MR. COHEN:  "They."  When the Government talks about

15  stuff, they call it a screed.  When they talk about the machete,

16  they call it a weapon.  But when we talk about it, we're just

17  saying he posted a statement six months after Charlottesville on

18  Facebook.

19            THE COURT:  Uh-huh.

20            MR. COHEN:  And what the goal of -- the reason for the

21  statement was that he was receiving constant threats.  He had lost

22  his job, as I told the Court earlier, at the end of August, and

23  there were constant threats and bad-mouthing on social media,

24  constant on social media.

25       And so Mr. White put together a 17-minute video and audio

1    that he posted on Facebook.  And, Your Honor, I would request --

2    I understand that this case has taken way more time than probably

3    anybody would like -- but I was able to obtain -- the Government

4    sent me the audio part of this statement.  I was able to obtain

5    the video because it's really a video that was posted.  And it's

6    very important that the video be looked at, I think, by the Court

7    because the comments by the Government and by the -- the Pretrial

8    Services is relying on about the fact that Mr. White made certain

9    statements after Charlottesville in terms of the four thousand

10   people there and what his intentions were and the adrenaline and

11   the -- these two white nationalist groups that I just talked

12   about, you have to look at them in the context of this entire

13   video.

14        Now, first of all, these two groups --

15             THE COURT:  Are you going to be submitting the video as

16   an exhibit?

17             MR. COHEN:  I would like to, but here's the thing.  We

18   just got the video last night and my associate, Alex Gilmartin,

19   was able to put it together in five parts, and he's emailed it to

20   me and to the Government.  So --

21             THE COURT:  How long is it?

22             MR. COHEN:  It's 17 minutes.  There's five parts and

23   it's 17 minutes.  But I would ask that the Court consider looking

24   at the entire thing.  I mean, look, let's put it this way:  It

25   would be a lot better if Mr. White had not posted any additional

1   items, but he did.  And the point of this and the point of what he

2   posted clearly in context is that he was saying to all the people

3   criticizing him, I'm not a member of these groups, that I don't

4   believe in a lot of the things that these groups believe in.  I do

5   believe in some of the points that the groups believe in.  I was

6   interested in going to see what they had to say and I went to

7   these two places.  But I am not the person that you think that I

8   am.

9       And so he took -- when he said, Oh, I -- he went to Europe as

10  a student for the reasons that he said.  You guys are saying that

11  somehow I'm this other person.  No.  He went to Europe with his

12  own money.  He worked.  He wasn't given money by some white

13  nationalist group.  And he went on these trips that we just

14  described.

15      The Alsar Aryan Alliance doesn't exist.  You Google Alsar

16  Aryan Alliance and you find nothing.  That's because it's fake.

17  It doesn't exist.  The Scottish National Resistance does not

18  exist.  It's fake.  So there's no way that Mr. White could meet

19  with leaders of these two groups because they don't exist.

20      And what he was saying in this video, probably in the way

21  that any 24-year-old would joke about -- about having this wife

22  and all those things that he did -- he has this kind of way of

23  joking about stuff that maybe, you know, if you're the parent,

24  you're putting your hand on your head and screaming.

25      But he's joking about it, but if you look at the video, what

1  you find is that when he talks about this part that's in here, "I

2  met with leaders of the Alsar Aryan Alliance that" -- he's trying

3  to say this is ridiculous, and he shows a picture of a tour guide

4  taking some people on a tour.  He says, "I met with the Scottish

5  National Resistance."  He shows a picture of a white cat.  Okay.

6  He says, "And the shocking footage of me at a white supremacist

7  rally" -- talking about in Europe was filmed -- he shows a picture

8  of this pond with a number of ducks on it and an arrow pointing to

9  one of the ducks.

10         THE COURT:  So he's trying to be funny and sarcastic.

11         MR. COHEN:  Well, he's trying to be funny and sarcastic.

12  And I think -- obviously, the operative word in that sentence,

13  Your Honor, is "trying."  I mean, we're not all really laughing

14  right now.

15         THE COURT:  Right.

16         MR. COHEN:  But it's -- it's not funny.  You know, at

17  the gate, they say, Don't joke about stuff when you're going into

18  an airport because that's not appropriate and they're going to

19  take everything very, very seriously.

20      But the context of this 17-minute video is he's saying, I'm

21  not part of this stuff.  I don't do that stuff, okay, and this

22  whole thing's being misunderstood and I've washed my hands of it.

23  I'm not doing it.  That's what it's about.  And he posted it six

24  months later 'cause he was doing other stuff and he wanted to make

25  sure that he posted it with a video and with the audio together.

1    Well, you know, great.  Great, so he took his time and he

2   posted it.  Now it's up there.  Now the FBI has it.  I get the

3   fact that they're looking at it.  But -- but they don't have any

4   evidence, other than this video that they're talking about, that

5   he traveled to Europe for the purposes of meeting with leaders of

6   these organizations or that that was his purpose or any evidence

7   that he traveled for the purposes of committing any type of

8   violence.

9    I looked over the weekend with Mr. Miselis who, frankly, if

10  you look at his reports, in my view was way more involved in

11  Charlottesville, but that's another matter.  But it's true that

12  the other two individuals were detained.  The only person that Mr.

13  White knew was Mr. Daley, as I said.  So the Government said that

14  the judge in Virginia overturned the $100,000 bond that was set by

15  the magistrate judge in Los Angeles.  And I looked at the docket

16  in Virginia and that's not what happened.  What happened was was

17  that the judge in Virginia -- his name is Judge Moon --

18          THE COURT:  Right.  And he'll be the judge -- he's the

19  district judge for the case.

20          MR. COHEN:  I believe he's the judge assigned to the

21  case.

22          THE COURT:  Right.

23          MR. COHEN:  So the Court may have seen the order then

24  that I'm talking about.

25          THE COURT:  I did.  It stayed the order.

1          MR. COHEN:  It's stayed pending review -- the briefs are

2    ordered to be filed two days before the hearing and basically what

3    the judge said is when the Defendants get to the Western District

4    of Virginia, we'll set a hearing.   File your briefs two days

5    before and I'll take a look at the bond.

6          So it's not as if he said, I don't think a hundred-thousand-

7    dollar bond is appropriate.  He just stayed it pending review.

8          THE COURT:  They did, and it had the effect of, you

9    know, preventing Mr. Miselis from being out of custody and going

10   to the Western District of Virginia on his own, though, because

11   the Court did order that he be forthwith transported to the

12   Western District of Virginia, and so all the further proceedings

13   on whether or not to affirm that order will be held there.

14         MR. COHEN:  Right.  I agree with Your Honor.  As we said

15   in our briefs, we don't agree that the Court in Virginia has the

16   ability to review the stay order by the magistrate judge if the --

17   I'm sorry -- it's a stay of the order by the magistrate judge.  We

18   think that any stay would have to be by a judge that supervises

19   Your Honor here in San Francisco.

20         That being -- so that's our position and that's what we would

21   seek to potentially pursue.  Of course, the issue is -- the issue

22   is how quickly could we do that.  I mean, it appears that the

23   order that they obtained from Judge Moon was pretty quick in the

24   other case.  There was no opposition, though, I note.  Mr. Miselis

25   didn't have a lawyer that filed against the Government.   The

1  Government made an application to Judge Moon and there was no

2  opposition 'cause he had no lawyer there.  We would endeavor to

3  file an opposition to anything filed by the Government.

4  　　　　　THE COURT:  I just would let you know that in my

5  experience dealing with these matters, the stay is pretty much

6  always granted.  It's just -- it's just to maintain the status quo

7  so that the district judge can then --

8  　　　　　MR. COHEN:  I understand.

9  　　　　　THE COURT:  -- review everything de novo.  That's

10  essentially --

11  　　　　　MR. COHEN:  I understand, and for the reasons we said in

12  our memorandum, we think as a matter of law any issue related to

13  the stay should be addressed by the duty judge here in San

14  Francisco.

15  　　　I understand -- I mean, maybe that's the way it's happened in

16  other cases.  But I'm saying as a matter of law, that's the way we

17  think it should happen.  In any event, if it did happen that way,

18  if the Government were to file an application to Judge Moon, we

19  would oppose it in Virginia.  I'm just saying Mr. Miselis did not.

20  　　　But the only reason I'm bringing all that up is just to point

21  out that it's not as if everybody's -- you know, when you start --

22  oh, they're detained.  Well, there's four defendants.  Two people

23  have been detained.  One person -- there was bond set for one of

24  the people and the second person we're still talking about it

25  right now.

1       Now, let me speak a little bit about Ms. Garcia, who has

2   several properties.   The reason -- we went down to Pretrial

3   Services after the hearing on Friday with Ms. Garcia and she

4   clarified with Pretrial Services that -- she's a Spanish speaker

5   and she clarified that she is willing to post any and all

6   properties -- she would prefer, obviously, to post one as opposed

7   to the other, the land, but she's not -- it's not as if she

8   wouldn't post the other properties.   She wants to get her grandson

9   out and she's here again -- she's traveled up again here from

10  Bakersfield.   She's here again this morning.   She got here at

11  midnight.   And the reason she's here is because she wants to make

12  real clear that, you know, to the extent there's any

13  misunderstanding, she has these properties and she has equity in

14  the properties.

15       THE COURT:   Is she able to understand what's going on in

16  these proceedings?

17       MR. COHEN:   I believe she is not able to understand

18  what's going on in these proceedings because it's not being

19  interpreted to her.

20       THE COURT:   Okay.

21       MR. COHEN:   So if she were to come here and speak to the

22  Court, we would have to do it through an interpreter.

23       I mean, I think that she -- when she was -- when she was just

24  nodding her head I think when I looked at her, she I think knows

25  that the point -- when I'm looking at her, the point I'm trying to

1   make is that she's willing to post the property.

2        She speaks kind of, you know, broken -- broken English.

3            THE COURT:  Okay.

4            MR. COHEN:  So, in any case --

5            THE COURT:  So did she clarify the addresses and --

6            MR. COHEN:  She did.  There was a misspelling on --

7   there was a misspelling on one or more of the addresses which is

8   one of the reasons that Pretrial was having trouble pulling it

9   from the public record.  She did have the deeds with her on Friday

10  and presented the copies of the deeds to Pretrial Services.

11           THE COURT:  Okay.

12           MR. COHEN:  So she has all that here in court and we

13  just kind of wanted to clarify that, that she's available.  And we

14  believe the equity in these properties is at least $500,000.

15       Now, I understand that normally when we talk about posting

16  bail as security, it's a security to bring somebody back to court,

17  which is clearly true.  But it's also true that the sureties sign

18  documents that say that if the defendant violates any one of the

19  conditions, then the bond could be forfeited.

20           THE COURT:  Right.

21           MR. COHEN:  And those conditions would be you can't

22  violate any state or local law.  But they could also specifically

23  be in this case, If you are found to have committed any type of

24  violent crime, then your grandmother's going to lose -- make it

25  real clear she's going to lose her property.

1          THE COURT:  Uh-huh.

2          MR. COHEN:  And so that's the reason why it seems to me

3    that under these circumstances, for the Government to say that

4    they have shown by clear and convincing evidence that there's

5    absolutely no combination of conditions that could assure Mr.

6    White's appearance is incorrect.    There is a combination of

7    conditions, given the nature and circumstances of this offense and

8    given the background of this particular individual and given his

9    family connections and his community ties and his lack of

10   substance abuse issues and his lack of mental issues and his lack

11   of record, there are conditions or a combination of conditions,

12   that can assure that he's not going to commit any type of offense

13   that's going to harm the community.

14         Every one of these alleged weapons are gone from him.  He can

15   be required not to have any weapon.  He can't have anything with

16   a little point on it.  And if he does that, then his grandmother

17   is going to lose her property.  They have to be real clear.  There

18   could be an ankle monitor on him so that he can be monitored at

19   all times.  He could be required to go to Virginia together with

20   his dad.  His dad could be his custodian.  He could have a curfew.

21   His dad could be ordered to go with him every time he goes to

22   Virginia and come back with him on the same flight.  And then when

23   he's back here, he could have a curfew and have his ankle monitor

24   and he could be released for the purposes of going to his school

25   and going to his job.

1      I think, by the way, that those conditions are excessive.

2  They are more than what's necessary under these circumstances to

3  assure that he's not going to be a danger to the community or a

4  flight risk, given the fact that he's surrendered his passport.

5  But there are conditions that assuredly could be set other than

6  custody and detention that, under all the circumstances of this

7  case, would assure that Mr. White is not a danger -- will not in

8  the future during the course of this matter be a danger to the

9  community.

10      Anyway, we would request that we mark as Defense Exhibit A

11  the video that I talked about -- the video/audio that I talked

12  about that has been emailed to me and to the Government and that

13  the Court review it, and we would stipulate and waive Mr. White's

14  appearance and the Court could -- we would have no problem with

15  the Court listening to it in chambers or wherever.  That wouldn't

16  be a problem.

17              THE COURT:  Uh-huh.

18              MR. COHEN:  We --

19              THE COURT:  Do you have it?

20              MR. COHEN:  I have -- I have it on my email and I've

21  sent it to the Government.  I could -- I could email, to the

22  Court's permission, to the Court's -- whatever email address the

23  Court gives to me.

24              THE COURT:  Okay.  Anything further?

25              MR. COHEN:  I'm sure -- not as an opening salvo.

40

1          THE COURT:  Okay.

2          MR. COHEN:  Thank you.

3          THE COURT:  All right.  I'll hear from the Government.

4          MR. KEARNEY:  Your Honor, the Government just flat out

5    disagrees on virtually every level.

6      At   the   outset,   we   agree   with   Pretrial   Services'

7    recommendation that this man is a danger to the community and that

8    he should be detained by the Court on that basis.

9      In this video that Defense wants to mark, this was the date

10   for the hearing today.  The Government's willing to stipulate that

11   the words that came out of the Defendant's mouth have explanations

12   for why he went to Europe that are -- are not nefarious.  We'll

13   stipulate to that.  I don't believe what he did delayed the

14   Court's decision to hear those.

15     I would ask the Court, rather than to focus on his words, to

16   focus on his actions.  And we've known -- since we were kids,

17   we've heard the phrase "Actions speak louder than words."

18     They do.  Gee, my -- my arms were held behind my back so I

19   had to head-butt.  Well, if you look at Exhibits 5 -- Government

20   Exhibits 5 and 6, which in the Government's estimation are flat

21   out  appalling  --  he  grabs  an  unarmed  smaller  woman  by  her

22   shoulders with his free arms and viciously head-butts her in the

23   center of the face.  She's wearing glasses.  And her face is split

24   open, according to pictures --

25          THE COURT:  So just so that I'm clear about what I'm

1  looking at in the photo, because I just want to make sure that I'm

2  not misunderstanding anything.  So in Government's Exhibit 5, for

3  instance, --

4         MR. KEARNEY:  Yes.

5         THE COURT:  -- I'm looking at a photograph of two white

6  males with white shirts on wearing sunglasses?

7         MR. KEARNEY:  Yes.

8         THE COURT:  And there's a woman -- appears to be a woman

9  that they're both grabbing --

10         MR. KEARNEY:  Yes.  And the --

11         THE COURT:  -- with their hands.  Which one is the

12  Defendant?

13         MR. KEARNEY:  And the -- the furthest most right, so he

14  is -- he's the gentleman who you can see that was left unextended

15  grabbing her with a -- his left arm and his right arm is out of

16  view in this photograph, but appears to be engaged with her.

17      In the next photograph, you can see --

18         THE COURT:  So just to make one point of

19  clarification, --

20         MR. KEARNEY:  Yes.

21         THE COURT:  -- so at least at this moment, his hands

22  were not behind his back while he was grabbing this woman?

23         MR. KEARNEY:  Absolutely

24         THE COURT:  Okay.

25         MR. KEARNEY:  And then in the next photograph, you can

1  see him actually head-butting her in the face.

2          THE COURT:  I do see that.  And I see both of his hands,

3  I think, in this one.

4          MR. KEARNEY:  Right.  And so just this notion that, Gee,

5  my hands were held behind my back so I had to head-butt in self-

6  defense, it's just flat out not true.  It's contradicted by the

7  basic evidence in this case.

8      And I would just underscore for the Court how extraordinary

9  it is that we have these images.  You know, we -- the Court deals

10  with violence in this courtroom almost every day.  Images of this

11  quality, where the Defendant admits that he is the person in the

12  photograph, are rare.  And I would ask the Court to base a

13  decision on the evidence, the facts before it, not on the

14  assertions of the Defendant.

15      The assertion that, Gee, I don't really know the co-

16  defendants, well, if you look at Exhibit 3, Your Honor, --

17          THE COURT:  Exhibit 3.

18          MR. KEARNEY:  -- the defendants -- this was the "Unite

19  the Right" group that engaged in much of the violence in

20  Charlottesville.  All four defendants are pictured in this

21  photograph in and around the banner that says "Unite the Right."

22  The Defendant in this photograph is the -- the gentleman kneeling

23  second from the left.

24      And that's graphic evidence that they are together.  There is

25  some level of a relationship.  They're posing in a photograph

43

1    together around a banner.  And --

2              THE COURT:  So is this the same day as --

3              MR. KEARNEY:  Charlottesville, yes.

4              THE COURT:  -- the Exhibits 5 and 6 that I was looking

5    at?

6              MR. KEARNEY:  It is.

7              THE COURT:  And that guy -- the other guy who is right

8    next to him looks like the same guy that was in the photo with

9    him.

10             MR. KEARNEY:  Yes.  And the other two defendants are

11   further -- as you look at this photograph, further on the right.

12             THE COURT:  Those are the other defendants?

13             MR. KEARNEY:  Yes.  I believe all four defendants are in

14   this photograph.  I think one of them is in a red cap.  One may be

15   kneeling off to the right there.

16             THE COURT:  Okay.

17             MR. KEARNEY:  Incidentally, the -- this notion that,

18   Gee, I'm more of a victim at these rallies than I am an aggressor

19   is just flat out contradicted by RAM's basic philosophy.  RAM, as

20   the Court knows, the Rise Above Movement, the emblem of which is

21   on a banner being held by the Defendant at Charlottesville on the

22   day of the crime, pretty direct link between the Defendant and

23   RAM.

24       They celebrate "the spirit of a fighter, our warrior spirit.

25   We want to rise above all of today's destructive culture and see

1  the rebirth of our people."  They actively promote physical

2  fitness and mixed martial arts fighting techniques.

3      In one of the images before the Court, this is Exhibit 4,

4  Your Honor, --

5          THE COURT:  Uh-huh.

6          MR. KEARNEY:  -- you'll see one of the defendants in the

7  red cap -- Mr. Miselis --

8          THE COURT:  That is Mr. Miselis.

9          MR. KEARNEY:  He went to the rally with boxer's tape

10  around his knuckles.

11          THE COURT:  I see that.  Yeah.

12          MR. KEARNEY:  Fairly instructive regarding their intent.

13  They are going looking for trouble.  They are going to incite

14  violence.  They celebrate the warrior spirit as part of their --

15  part of their unifying bond as a group.

16      So the fact that, Gee, violence happened when we were at this

17  group, it just doesn't ring true.

18      Regarding the Nazi knife, Gee, it's a souvenir from Budapest,

19  the Government --

20          THE COURT:  Okay.  So just to be clear on the record,

21  we're talking about Exhibit Number 9.

22          MR. KEARNEY:  This is Exhibit 9, I believe.

23          THE COURT:  Uh-huh.  Does that have some kind of a

24  sheath over it?  Is that what that is that I'm looking at?  I

25  can't really tell.

1          MR. KEARNEY:  I'm told by the FBI it does have a sheath

2    over it.  Yes.

3          THE COURT:  Oh, okay.

4          MR. KEARNEY:  Your Honor, many of us have been to

5    Budapest.  Many -- but we don't come home with Nazi souvenirs.  We

6    come home with snow globes of the island or -- or something of the

7    like.

8       The fact that -- even if you believe the Defendant's story

9    that he -- this was a souvenir, the fact that he would select a

10   Nazi souvenir to bring home from Europe, while affiliating with a

11   group that espouses white supremacist ideals, the Government would

12   submit to the Court is not a coincidence.  Again, actions speak

13   louder than words.  Bring home a snow globe next time from your

14   trip to Europe.

15      Likewise, with Exhibit 11, the improvised devices, they're

16   nasty improvised devices.  The whole skateboarding story -- we all

17   know skateboards.  We all have kids.  Those are weapons.  Those

18   are not tools to work on a skateboard.

19      The -- we know of three occasions when the Defendant went to

20   rallies and used violence -- once in Berkeley -- we believe that

21   there was -- he attended other rallies in Berkeley in early 2017,

22   potentially February, March, and April.  We know he used violence

23   during one of them -- in April of 2017.

24          THE COURT:  Uh-huh.

25          MR. KEARNEY:  Then twice in Charlottesville -- during

1    the tiki torch -- and, by the way, what an anachronistic

2    photograph, Exhibit 1.  It belongs in a different century than the

3    one we're living in.

4         But the second photograph in that series is of this Defendant

5    admittedly -- he identified himself in the photograph to the FBI

6    swinging a tiki torch as a weapon.  So three occasions that we

7    know of the Defendant engaged in violent conduct.

8              THE COURT:  So one was the day before the big rally?

9              MR. KEARNEY:  The night before, yes.

10             THE COURT:  This is the March --

11             MR. KEARNEY:  Yes.  So the -- once at Berkeley, once in

12   the tiki torch evening march, --

13             THE COURT:  Okay.

14             MR. KEARNEY:  -- and once during the "Unite the Right"

15   rally.

16             THE COURT:  I see.  Okay.

17             MR. KEARNEY:  Your Honor, the Government has no way of

18   knowing who the Defendant met with in Europe other than words that

19   came out of his own mouth.

20        But even assuming he met with no one while there except maybe

21   an ex-paramour or friends or something, we know for a fact that in

22   the last four years he visited seven countries in Europe on --

23   during three separate trips.  That is a significant amount of

24   international travel from a young man who has every reason to

25   flee, who's facing felony charges.

1     He has zero ties, as far as we can tell, to the Western

2  District of Virginia, by the way, beyond having gone there to

3  engage in violence.

4     The fact that we have his passport -- unfortunately, we don't

5  live in a perfect world.  People can get passports in other

6  countries on the street.  There is every incentive to flee.  He

7  doesn't have a particularly compelling job here to keep him here.

8  He doesn't have a wife or kids here.

9     He has contacts abroad in numerous countries.  He's a prime

10  candidate to flee.  Even though Pretrial Services didn't find that

11  as a basis for detention, the Government would argue that he is a

12  flight risk.

13     The -- I am told by the FBI that on April the 16th, 2017, the

14  Defendant engaged in a "Ask Me Anything" chat on 4chan.org.

15         THE COURT:  April -- say that again -- April 16th?

16         MR. KEARNEY:  April 16th, 2017, I believe.

17         THE COURT:  2017.  Okay.

18         MR. KEARNEY:  And during that online chat, he opined

19  that his strength was in is legs and he likes to head-butt.  The

20  Government would leave that with the Court.  I believe his actions

21  in actually head-butting a woman in the face who's wearing glasses

22  tells us, just as Pretrial Services did, that this man's a danger

23  to the community and he should be detained.

24         THE COURT:  Where was the -- where was this chat again?

25         MR. KEARNEY:  I'm told it was on AMA, "Ask Me Anything,"

1   on 4chan.org on April 16th, 2017.

2           THE COURT:  Okay.

3           MR. KEARNEY:  Submit, Your Honor.  I'm happy to answer

4   any questions.  Just in terms of the legal analysis, the 3142(g)

5   factors, the nature and circumstances of the offense -- I won't go

6   back into them -- but it's voluntarily traveling to engage in

7   violence.  So I think that's been established.

8       The weight of the evidence is overwhelming.  He's been caught

9   on video and admitted that it was him in the video.

10      The history and characteristics of the crime, the nature and

11  seriousness and danger -- they're all high.  I believe all those

12  factors point to detention, Your Honor.

13      Submitted.

14          THE COURT:  Okay.  Anything more from the Defense?

15          MR. COHEN:  Yes, Your Honor.  There's a number of the

16  points that Mr. Kearney made to which we don't agree.  And I'll

17  try go through them as briefly as I can.

18      So Your Honor I think noticed that I spoke about the NPR --

19  I'm sorry -- the National Geographic video relating to

20  Charlottesville from April of 2017.  And, actually, in light of

21  what Mr. Kearney just said, I'd also ask that I be permitted to

22  submit that particular -- that particular video to the Court as

23  well if the Court is going to look at the other proffered video

24  because while the Government has put together several screenshots,

25  what they don't show is what happened in context.

1    And what happened in context is exactly what I earlier
2    described.  There are parts of the video where you can see that --
3    that Mr. White has his hands behind his back.  Even in the picture
4    that Mr. Kearney is talking about, his right hand is behind his
5    back and is being held by Mr. Daley.  The context of it also is --
6    the Government has put forward these videos -- I'm sorry -- these
7    screenshots from the day of the rally and says, Oh, he was
8    grabbing people when he was trying to do what have you.  Well,
9    these people were rushing the group.  They were told to march two
10   by two and not engage.  And the individuals were rushing the
11   group, and its clear in the video that they're rushing the group.
12   And what Mr. White is doing is he's pushing them back.  It's clear
13   that at different times both his hands are behind his back.  Even
14   in the picture where Mr. White -- this is Government Exhibit 1, 2,
15   3 -- in Government Exhibit 5 --
16        THE COURT:  It's not clear to me that his hand is behind
17   his back.  I can't tell where it is.
18        MR. COHEN:  No, no.  Well, his right hand is -- his
19   right hand is behind -- I'm sorry -- his left -- his right hand is
20   behind his back.  Mr. Daley --
21        THE COURT:  I can't tell that from looking at this
22   picture, though.
23        MR. KEARNEY:  Your Honor, I would -- Counsel, I would
24   ask you to flip the page to Exhibit 6.  His right hand is clearly
25   visible.  It's not being held.  I --

1          THE COURT:  I can see both of them.

2          MR. COHEN:  Well, that's the --

3          MR. KEARNEY:  It's not being held back by anybody.

4          MR. COHEN:  That's -- yeah.  That's her hand in Exhibit

5     6.  It's not his hand.  His hand is behind his back.  And even

6     more in the context of the -- of the National Geographic video --

7          MR. KEARNEY:  Counsel, I have to stop.  It's not her --

8     it's not her hand.

9          THE COURT:  No. It's his hand.

10         MR. KEARNEY:  His hand is clearly visible.

11         MR. COHEN:  Well --

12         THE COURT:  It's definitely not her hand.  Okay.  Go

13    ahead.

14         MR. COHEN:  My point is that if you look at the context

15    of this video, his hands were behind his back for a lot shorter --

16    when they were rushed.  He was struggling to try to defend against

17    people that were rushing him.

18         This woman rushed -- rushed -- and rushed back again after

19    she was bleeding.  She -- and you can see her running back into

20    the fray.  They were marching on the side of the road.  They had

21    a permit.  And they were being rushed by individuals and he was

22    pushing back.  Okay?

23         So it's important to look at the context of the entire video

24    and that's why I started with the video.  So I'd ask that the

25    Court look at the National Geographic video in addition to these

1  screenshots --

2          THE COURT:  Is this something you intend to provide to

3  the Court?

4          MR. COHEN:  I can provide it by email.  I got -- I was

5  able to obtain this over the weekend.  I can provide it to the

6  Court.

7      But I -- but, look --

8          THE COURT:  We're having our detention hearing now so,

9  I mean, if you have exhibits that you want to present at this

10 hearing, now is the time to present them.

11         MR. COHEN:  Okay.  I mean, I have the video.  I got it

12 over the weekend.  I can email it to the Court.  I don't have the

13 video in my possession right now.  And even if I did, we'd have to

14 sit here and play it.

15     I'm saying that if the Court's going to look at the other

16 video in chambers, I can get the Court these videos so the Court

17 can take a look at it.  But --

18         THE COURT:  I don't know that I find the video that

19 you're proposing that I watch of the Defendant six months after

20 the rally with him having the same threats or whatever and, you

21 know, wanting to defend himself after the fact is really very

22 relevant.

23         MR. COHEN:  Well, if the Government is not going to rely

24 on the statements in the Pretrial Services report that he went

25 overseas to meet with the leaders of these two fictitious white

1  nationalist groups, if that's not what the Government is relying

2  on and the Court is not relying on it, then of course it's not

3  something that the Court would need to take a look at.

4       But the Pretrial Services report very clearly says that he's

5  traveled internationally to commit crimes of violence and, not

6  only that, he's met with these white nationalist groups and, not

7  only that, the only reason why he went on these two occasions was

8  to meet with white nationalist groups.  That's just not correct.

9       So if the Court is not going to rely on all of that and is

10  accepting what we're saying, I agree with the Court -- that the

11  Court wouldn't necessarily need to take a look at that particular

12  video.

13       That being said, I think the National Geographic video is --

14  shows the context of how these individuals were rushed and Mr.

15  White's reaction.

16       And even if -- I mean, we don't agree with this because we

17  think that -- you can show screenshots out of context in any

18  video.  You need to look at the whole circumstance.  But even if

19  Mr. White head-butted this woman on this occasion, even if he did

20  it, whether or not his hands were behind his back, that does not

21  -- that does not amount to a fact that should now result in him

22  being detained with no conditions.  I mean, they're not -- I mean,

23  this position of saying one thing that he did in 24 years is the

24  object of this case.  I mean, the Government's talking about he

25  has an incentive to flee, he's gonna somehow manufacture a

1    passport, he's gonna somehow disappear, they have no basis for

2    that.   They have no basis for that if he has an electronic

3    monitor, if he has strict conditions, and he's reporting to

4    Pretrial Services.   They have no basis for the idea that he's

5    going to flee.

6         He has very clear ties to this community.

7         So they say, well, he's facing a felony, so he has an

8    incentive to flee.   That means anybody facing a felony would have

9    an incentive.   He's facing a felony where the maximum is five

10   years.   As I briefed to the Court, the proposed -- there's no

11   proposed -- there's no guidelines to this felony.   We're

12   instructed to look at analogous guidelines and it's not clear what

13   the analogous guidelines are.   But the proposed guideline a number

14   of years ago, as I briefed to the Court, was a guideline -- and

15   I've mentioned this before -- where the high end would be 18

16   months, where Mr. White would be eligible for half the time in a

17   halfway house, half the time on home detention, half the time in

18   custody, and the low end on several different levels with his

19   record would be straight probation.

20        The idea that he's facing something along those lines and

21   what he's going to do is he's going to flee, cause his grandmother

22   to lose her property, and be facing immeasurable additional time

23   makes absolutely no sense -- that somehow now, given all this and

24   all the support, he's going to somehow go to Europe.   He allegedly

25   has his friends there, these multiple friends.   They haven't

1    identified one friend.

2         They say at this late date that there were other rallies that

3    he attended in Berkeley.  We haven't seen any evidence of any of

4    those rallies.  They proffer that.  We proffer that he did not.

5    If they have evidence of those other rallies, they should produce

6    it -- that he attended in Berkeley.

7         Right now, we have evidence of this one rally.

8         So they talk about this chat from the -- this AMA chat.  I

9    respectfully submit that if the Court is not going to be looking

10   at the -- at the video at this point, looking at the subsequent

11   AMA chat is something the Court should also consider not looking

12   at because --

13             THE COURT:  I wasn't planning on looking at it.

14             MR. COHEN:  -- I could go and get the AMA chat and show

15   the whole thing to the Court in context.  But I would encourage

16   the Court to please not look at that latest piece of the proffer

17   because that puts me in the position of having to go get the

18   entire chat and submit it.

19             THE COURT:  No.  I'm accepting it as the Government's

20   proffer.  I'm not going to go look at it.

21             MR. COHEN:  I understand that, but I'm saying that the

22   Government has quoted what they've quoted from this chat --

23             THE COURT:  Uh-huh.

24             MR. COHEN:  -- out of context.  And what I'm saying if

25   the Court is going to rely on what the Government said at all, --

1        THE COURT:  Well, I'm going to take everything into
2   consideration that both sides are arguing here today.
3        MR. COHEN:  Okay, so that's fine.  But I'm saying the
4   chat itself in context shows that Mr. White was not participating
5   -- and that's what the whole chat was about -- he was not
6   participating in these groups.  He was not part of these white
7   nationalist groups.  He was at a Walmart -- and he told the FBI
8   this -- he was at a Walmart in Charlottesville where other people
9   were buying tape for their hands and he bought nothing.  He didn't
10  buy any tape for his hands.  He never had any tape on -- in any of
11  these rallies.  And there's nothing in the videos from Berkeley
12  that shows that he had any -- that he was armed in any way.
13       So the idea that there's some people that might have had tape
14  on their hands -- by the way, the guy who had tape on his hands
15  has been released on a $100,000 bond -- but -- not released, but
16  set a $100,000 bond -- it doesn't apply to my client.
17       And the fact that he is sitting next to other people in a
18  picture doesn't prove -- on the same occasion as this incident --
19  doesn't prove that he's been a member for a long period of time in
20  these groups.
21       I notice that Mr. Kearney said in his proffer, you know, this
22  group that was marching in Charlottesville, part of their belief
23  is that they're supposed to take other people on.  That doesn't
24  have anything to do with what they were doing this day because
25  they had a permit and they were specifically ordered and told not

1    to engage, and they were rushed in the video that you can see, the

2    National Geographic video.

3        The fact that other people in the group might have had

4    whatever belief, that wouldn't be admissible in a court of law.

5    It wouldn't be admissible under Rule 404 in any way.   It has

6    absolutely no place in any type of court -- the fact that some

7    other people might have believed something about something.   It

8    has nothing to do with what they did on this occasion.

9        And I noticed that he said, you know, These torches, the way

10   these people look in Government's Exhibit 1, this looks like it's

11   out of another century, it's out of another era.   Well, that's

12   what this case is about.   I mean, the Government would not be

13   arguing for two head-butts, however -- whatever the circumstance

14   surrounding it.   The Government has their version of how the head-

15   butt happened and we have our version, but however it happened --

16   they wouldn't be arguing that two different head-butts are

17   sufficient to hold the man in custody on those conditions, except

18   for the fact that the Government is saying, This is out of another

19   era.   These are the types of beliefs, these are the type of people

20   in the United States that we want to hold in custody.   And that

21   should have no place in this Court's consideration today.

22       It's simply what is he charged with, what's he looking at,

23   and are there conditions or combinations of conditions that can

24   assure that he's not going to be a danger to the community given

25   all the information that's been presented to the Court.

1        THE COURT:  Mr. Kearney, is that how the Government sees

2  -- is that what this case is about -- two head-butts?

3        MR. KEARNEY:   No.   It's about a pattern of violence

4  engaged in by this Defendant.

5        MR. COHEN:  And that's a -- you know, that's a stretch

6  on the evidence that the Government has put forward before this

7  Court.  The Government might believe that.  Maybe they're still

8  investigating.  But there isn't anything to show that there's a

9  pattern of violence by this individual.  There's evidence to show

10  that he went to these two rallies and he did whatever he did at

11  the rallies.  We can argue about what the videos and the audio

12  shows or the screenshots, but that's it.  Nobody was permanently

13  allegedly hurt.  Nothing along those lines happened.  There was no

14  gun.  There was nothing like that.  That's what they're talking

15  about.  So it just does not rise to the level of detention.  It

16  arises to the level of strict conditions that will assure that my

17  client will not engage in any type of behavior that would be

18  dangerous to the community.

19        THE COURT:  Okay.  So I am not going to drag this out

20  longer by having submissions of emailed video, etc.  I'm just

21  going to take under submission the proffers by both sides and take

22  a brief recess.

23        But before I do that, I do have one other matter that was on

24  calendar that was just a status, and I would like to get that out

25  of the way so that then I can take the recess and then come back

1    and give you my decision.

2              MR. COHEN:  Right.  And I guess Mr. Babcock's client

3    wasn't here.  Otherwise, I would have encouraged him to go first.

4              THE COURT:  Right.  Exactly.

5              MR. COHEN:  Okay.

6              THE COURT:  I understand.

7              MR. COHEN:  All right.  Thank you.

8              THE COURT:  All right.

9         (Recess from 11:21 a.m., until 12:31 p.m.)

10             THE CLERK:  Recalling 18-71386, USA v. Cole White.

11             THE COURT:  Counsel, please state your appearances for

12   the record.

13             MR. KEARNEY:  Philip Kearney for the United States

14   again, Your Honor.  Good afternoon.

15             THE COURT:  Good afternoon.

16             MR. COHEN:  Good afternoon, Your Honor.  David Cohen on

17   behalf of Mr. White, who is present before the Court.  He's in

18   custody.

19             THE COURT:  Okay.  Good afternoon again.  So I took

20   everything under consideration, including the proffers of the

21   parties and the Exhibits 1 through 11 submitted by the Government,

22   as well as the recommendation of Pretrial Services.

23        And looking at risk of flight, I find that the Government has

24   shown by preponderance of the evidence that the Defendant is a

25   risk of flight.  And given -- for all the reasons stated in the

1    Pretrial Services report, including the Defendant's travel across

2    the country for participation in at least one riot that resulted

3    in violence and his own violence in that riot, that he traveled to

4    Europe by his own words to meet with white supremacist groups.

5    Now, whether or not he really was joking about that, I don't know.

6    But, you know, it's not a laughing matter or a joking matter and

7    that's something that I've taken into consideration even though

8    it's not the heaviest-weighed thing that I've considered.

9        And the fact that he is facing up to five years if he's

10   convicted, that he has no ties to the community in the Western

11   District of Virginia, he may or may not still be employed, and

12   that he has potentially international associates.

13       If this case were not across the country, in the Western

14   District of Virginia, I might consider some very stringent release

15   conditions, including posting real property.  But all of the

16   information available to me suggests that there are no conditions

17   or combination of conditions to reasonably assure the Court that

18   he would appear in the Western District of Virginia for trial.

19       And as to risk of danger, I find that there is clear and

20   convincing evidence that the Defendant is a danger to the

21   community, for some of the same reasons.

22       And starting with the nature and circumstances of the offense

23   -- and I will outline this in more detail in my order -- that

24   riots and conspiracy to riot involves violence in every element.

25   And, in fact, the statute goes on in the definitions to clarify

1   that the riot offense is not one that sounds more like an

2   expression or espousal or beliefs like you might see in sort of a

3   First Amendment context, that it actually is about violence and

4   promoting violence, supporting violence.

5       And so to the extent that the weight of the evidence is

6   strong against him, it is a crime of violence in my view and that

7   weighs in favor of detention.

8       And I did not believe the explanations provided by Defense

9   counsel for the -- for the Defendant's activities.  I find the

10  photographs that have been submitted to me to be clear and

11  convincing evidence that the Defendant participated in RAM, that

12  he is at least an associate of some sort of that organization,

13  which is a white supremacist hate group, and that he participated

14  in a march with them and then a subsequent rally, a "Unite the

15  Right" rally that resulted in acts of violence by him personally

16  as seen in these photographs.  And I do not buy the explanations

17  that defy what I'm looking at in these photographs.

18      And then his international travel, the fact that his

19  activities are captured on video and photos committing violence,

20  and his access to the Internet which was used by the RAM

21  organization to plan and coordinate the commission of violence and

22  encourage others to do so, and that's really hard to monitor,

23  especially if he's going to be traveling between here and the

24  Western District of Virginia.

25      Also going to danger would be the fact that he possessed at

1  the time of his arrest a machete under his mattress, a knife with

2  the swastika Nazi symbol on it in his closet, and an asp baton in

3  a bag under his bed, and two improvised weapons in his car.  And

4  I don't find credible any of the explanations provided for having

5  any of those weapons, nor do I find that the weapons for the

6  improvised weapons were for snowboarding or skateboarding.  I

7  think snowboarding and skateboarding are pretty common sporting

8  activities and it's just not credible that either of these things

9  are necessary for that or to even open tape on boxes that you've

10 attached to your Vespa.

11      In particular, the one that's supposedly for skateboarding,

12 there's nothing about that that amounts to a tool of any kind that

13 would be used for a skateboard, in my view, so I just don't find

14 it credible at all.

15      And for all of those reasons, I find that the Defendant

16 presents a danger to the community that cannot be addressed by

17 conditions or combination of conditions.  So he will be detained

18 and he will go to the Western District of Virginia to face the

19 charges.

20      I did look up the statute regarding review of a magistrate

21 judge's order, and Section 3145(a) and (b) clearly set forth that

22 any review of my order has to go before the court with original

23 jurisdiction over the offense, so that would be whether there was

24 a release order or a detention order.

25      And just as a matter of sort of effect, even if I had ordered

1    him released, I would have stayed my order pending review by the

2    Western District of Virginia and he still would have been removed

3    forthwith to the Western District of Virginia to face the hearing

4    there with Judge Moon.  So either way it goes, he was not going to

5    be out of custody to go to the Western District of Virginia.

6        So that's my order.  I will, like I said last week, prepare

7    a written order on all of the issues that we've touched on in this

8    continued detention hearing, and so that should come out in a

9    couple days.

10       But as to the -- this part of the hearing, I would appreciate

11   it if the AUSA would prepare a proposed order on the Bail Reform

12   Act considerations and then send it to me in a Word version so

13   that I can edit it and add all of my discussion that's going to go

14   before that regarding why I believe we are entitled to have a

15   hearing on this matter in the first place.

16       MR. KEARNEY:  That's fine, Your Honor.  Does the Court

17   have a time frame for that Word version of the order?

18       THE COURT:  You know, the sooner you can get it to me,

19   the better.

20       MR. KEARNEY:  All right.

21       THE COURT:  Because I imagine Defense counsel's going to

22   want it to be reviewed by Judge Moon or maybe he'll want to argue

23   that that judge is not the right judge.  But the statute's very

24   clear -- it's not ambiguous at all -- that it would be Judge Moon

25   who would have to review it.

1          MR. KEARNEY:  All right.

2          THE COURT:  Okay.

3          MR. KEARNEY:  Thank you, Your Honor.

4          THE COURT:  Okay.

5          MR. COHEN:  Your Honor, may I request that before Your

6   Honor signs the proposed order, that I be copied on it so I can

7   give Your Honor my input as to the proposed order?

8          THE COURT:  Absolutely.

9          MR. COHEN:  And I would also say that to the extent that

10  Your Honor's relying on the photographs, it was our position that

11  we would like to -- we would have liked to submit these two videos

12  for Your Honor's consideration.  And to the extent that that was

13  not available, I think it should be noted, unless Your Honor is

14  saying that no matter what these videos showed, it wouldn't make

15  any -- it wouldn't have made any difference.

16         THE COURT:  Well, the first thing -- the first point

17  I'll make about that is that the hearing was today and it's been

18  continued a couple of times.  And so if you had evidence that you

19  wanted to present at this hearing, today was the day to do it.

20  It's not -- it's not okay to tell me that we're going to have this

21  hearing and then you're going to email me some videos that you

22  want to submit and I'm supposed to figure out what I'm supposed to

23  get out of them and which portions I'm supposed to review.  That

24  is not the proper way to present or proffer evidence at a hearing.

25         MR. COHEN:  Well, I think -- I think as far as the

1    proffer is concerned, I described what the videos would show and

2    I think that is the appropriate way to proceed at a detention

3    hearing by proffer.

4              THE COURT:  And I did hear what you proffered and then

5    I also looked at the photographs, which are pretty clear to me

6    that your client's hands are not behind his back in either one of

7    the three -- actually three photographs nor that your explanation

8    does not seem to add up to the photos that I'm looking at of him.

9              MR. COHEN:  But in --

10             THE COURT:  But I'm not going to debate that with you.

11   My order is going to be what it is.  And I've not allowed you to

12   continue this hearing any further by emailing me things that you

13   have not provided to the Court today.

14             MR. COHEN:  I understand that.

15             THE COURT:  Okay.

16             MR. COHEN:  But just so that it's clear for the -- for

17   any kind of review, can the Court assess how important to the

18   Court's findings the fact that his hand was behind his back or not

19   behind his back?

20             THE COURT:  No.  It's just one of many elements that the

21   Court has considered in making its decision.  And, of course, if

22   you would like to have the judge in the Western District of

23   Virginia review it, he will review it de novo.

24             MR. COHEN:  I understand that.

25             THE COURT:  So if you would like to submit additional

65

1  things to him, you are perfectly allowed to ask -- to do it.

2         MR. COHEN:  And we understand.  All right.  Thank you,

3  Your Honor.

4         THE COURT:  Okay.

5         MR. COHEN:  We appreciate it.  Thanks for your patience.

6         THE COURT:  All right.  Thank you.

7         THE CLERK:  Court is in recess.

8         MR. KEARNEY:  Thank you.

9         THE COURT:  Thank you.

10     (Proceedings adjourned at 12:44 p.m.)

11

12         I, Peggy Schuerger, certify that the foregoing is a

13  correct transcript from the official electronic sound recording

14  provided to me of the proceedings in the above-entitled matter.

15

16      /S/ Peggy Schuerger        October 16, 2018
  Signature of Approved Transcriber     Date

17

  Peggy Schuerger
18  Typed or Printed Name
  *Ad Hoc Reporting*
19  Approved Transcription Provider
  for the U.S. District Court,
20  Northern District of California

21

22

23

24

25