UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>COLE EVAN WHITE,<br><br>Defendants. | Case No.: 4:18-mj-71386-MAG-1 (NDCA)<br>3:18-cr-00025-NKM-JCH (WDVA)<br><br>**ORDER RE: GOVERNMENT'S MOTION FOR DETENTION HEARING AND ORDER OF DETENTION**<br><br>Re: Dkt. Nos. 6-7 |

Defendant Cole White was arrested in California on a complaint issued by the Western District of Virginia alleging one count of Conspiracy to Commit Riots in violation of 18 U.S.C. § 371 and one count of Riots in violation of 18 U.S.C. § 2101. (Dkt. No. 1.) Defendant first appeared before the Court on October 3, 2018, represented by a Federal Public Defender. Because Defense Counsel was unavailable that day, a hearing for identification of counsel and status conference regarding a detention hearing and identity removal hearing was set for the next day. On October 4, 2018, Defense Counsel appeared. A detention hearing was set for October 10, 2018 after Defendant requested a continuance to give Defense Counsel time to prepare for the detention hearing, and to submit briefing regarding the validity of holding a detention hearing in this case. On October 9, 2018, both parties submitted briefs regarding the validity of the detention hearing and detention of Defendant pending trial. (Dkt. Nos. 8 & 9.) The detention hearing was continued to October 12, 2018 on Defense Counsel's request. On October 11, 2018, Defendant submitted a further brief regarding the potential order of detention. (Dkt. No. 11.)

A detention hearing was held on Friday, October 12, 2018. The Court was informed that the Western District of Virginia had received an indictment against Defendant and his three co-defendants on October 10, 2018, for the same two counts charged in the complaint. (W.D. Va.

Case No. 3:18-cr-00025-NKM-JCH, Dkt. No. 8 ("W.D. Va. Indictment").) After reviewing the Pretrial Services report, which recommended detention of Defendant based on risk of danger, Defense Counsel requested a second continuance to prepare a rebuttal to the report findings. After admonishing Defense Counsel that seeing the Pretrial Services report for the first time on the morning of the hearing was standard protocol, the Court found good cause for the continuance based on the number of report findings that Defense Counsel claimed to have not known prior to reading the report and set the continued detention hearing for Monday, October 15, 2018. At the October 15, 2018 hearing, both parties produced evidence regarding the detention of Defendant.

Upon consideration of the parties' filings and the arguments presented at the October 12, 2018 hearing, the government's motion for detention hearing is granted. Additionally, upon consideration of the parties' filings, as well as the arguments presented at the October 12, and October 15, 2018 hearings, Defendant is ordered detained and removed to the Western District of Virginia forthwith.

**I.  DETENTION HEARING**

A detention hearing may be held "to determine whether any condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The detention hearing shall be held upon motion of the government in a case that involves "a crime of violence" or "a serious risk that such person will flee." 18 U.S.C. §§ 3142(f)(1)(A), (2)(A). As the government argues for a detention hearing under both subsections of section 3142(f), the Court addresses each basis in turn.

**A.  Crime of Violence**

A "crime of Violence" is defined by the Bail Reform Act as either "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" (elemental clause) or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (residual clause). 18 U.S.C. §§ 3156(a)(4)(A), (B).

*1. Elemental Clause*

The government argues that rioting contains the element of use, attempted use, or threatened use of physical force because to riot requires at least one act of violence or one threatened act of violence. (Gov't Brf. at 3, Dkt. No. 6.) Defendant responds that the use of force is not an element of the offense because "the language of §§ 2101 and 2102 permits a conviction where the defendant does not commit any act of violence but, rather, travels interstate to merely 'promote' or 'encourage' a 'public disturbance' that involves 'a threat . . . of the commission of an act or acts of violence.'" (Def.'s Brf. at 7, Dkt. No. 7).

The Court finds that rioting is a crime of violence under 18 U.S.C. § 3156(a)(4)(A). The elements for the crime of rioting require that the person travel in interstate or foreign commerce, or otherwise use any facility of interstate or foreign commerce, "(1) to incite a riot; or (2) to organize, promote, encourage, participate in, or carry on a riot; or (3) to commit any act of violence in furtherance of a riot; or (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot," and overtly act, or threaten to overtly act for any of the four above purposes. 18 U.S.C. § 2101(a). Section 2102 defines "riot" as a public disturbance involving an act or threat of committing an act of violence which "shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual." 18 U.S.C. § 2102(a). Thus, by definition, a riot has as an element, the use, attempted use, or threatened use of physical force. Rioting, therefore, qualifies as a crime of violence as defined in 18 U.S.C. § 3156(a)(4)(A), and thus, entitles the government to a detention hearing.

To the extent Defendant argues that "Mr. White could be convicted of a violation of § 2101 despite not having committed nor aided an act of violence, but merely because he encouraged or participated in a public disturbance at which other participants threatened violence," the Court disagrees. (Def.'s Brf. at 8.) Notably, section 2102 clarifies that "to incite a riot," or "to organize, promote, encourage, participate in, or carry on a riot" "shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief." 18 U.S.C. § 2102(b). At a bare minimum, the person accused of rioting must have urged or instigated other

3

1 persons to riot, or, in other words, urged or instigated other persons to use or threaten physical

2 force. *Id*. Moreover, the urging and instigating must have "such capacity to propel action that it is

3 reasonable to treat such speech as action." *United States v. Dellinger*, 472 F.2d 340, 360 (7th Cir.

4 1972). Thus, a § 2101 violation requires more than mere speech, but the "urging or instigating" of

5 a violent action sufficient to be treated as an act. Through this requirement, the statute is careful

6 not to implicate First Amendment concerns.

### 2. *Residual Clause*

The government further argues that because riots, by their nature, involve a substantial risk that physical force may be used, rioting qualifies as a crime of violence that entitles the government to a detention hearing. (Gov't Brf. at 4-5.) Defendant counters that section 3156(a)(4)(B) is unconstitutionally vague, citing cases that have found substantially identical clauses unconstitutionally vague because the "substantial risk" language of this clause forces the Court to "imagine an idealized ordinary case of the crime." (Def.'s Brf. at 9.) Specifically, Defendant points to *Johnson v. United States*, 135 S. Ct. 2551 (2015) and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). These cases, respectively found unconstitutionally vague the "crime of violence" residual clause of the Armed Career Criminal Act and the Immigration and Nationality Act, both of which have substantially identical language to the Bail Reform Act's "crime of violence" residual clause.

Defendant, however, fails to recognize that both cases deemed the clauses unconstitutional because of the categorical approach with which courts applied them. *See Johnson*, 135 S. Ct. at 2561; *Dimaya*, 138 S. Ct. at 1215-16. Both cases noted that they do not doubt the constitutionality of applying these types of clauses to "real-world conduct." *Id.* In other words, the Supreme Court's concern with these two clauses was that they required courts to create an "idealized ordinary case of the crime." *Dimaya*, 138 S. Ct. at 1216 (citing *Johnson*, 135 S. Ct. at 2557-58).

Two circuit courts since *Johnson* and *Dimaya* have taken a conduct-based approach to identical residual clauses. In *United States v. Barrett*, the Second Circuit found that 18 U.S.C. § 924(c)(3)(B), which has virtually identical language to section 3156(a)(4)(B) in the Bail Reform Act, was not unconstitutional, because a conduct-specific, rather than categorical approach to the

4

residual clause was appropriate. 903 F.3d 166, 178 (2d Cir. 2018). Likewise, in *Ovalles v. United States*, the Eleventh Circuit found that 18 U.S.C. § 924(c)(3)(B)'s residual clause was not unconstitutional when analyzed under a conduct-specific approach, *i.e.*, where the determination was made by reference to the "actual facts and circumstances underlying a defendant's offenses." *Ovalles v. United States*, __ F.3d __; 2018 WL 4830079 (11th Cir. 2018). In both cases, the conduct-based approach was appropriate because the predicate offense defined by the statute is an element of the crime pending prosecution. In contrast, *Dimaya* and *Johnson* concerned a crime of prior conviction, as both cases looked at their respective residual clauses as raising due process vagueness concerns for crimes that the defendants had already been convicted of. *Johnson*, 135 S. Ct. at 2559; *Dimaya*, 138 S. Ct. at 1216.

In the present case, because physical force is an element of the crime pending prosecution, the Sixth Amendment concerns raised in *Dimaya* and *Johnson* are not implicated. The Court can make preliminary findings as to the actual facts of the crimes alleged to determine if they constitute a crime of violence, rather than imagining the "idealized ordinary case of the crime" that *Dimaya* found problematic.

Accordingly, the Court finds that the Bail Reform Act's residual clause is not unconstitutionally vague. The Court agrees that a conduct-based approach applies; therefore, the Court need not identify an "ordinary case" of Riots and Conspiracy to Commit Riots to make a violent crime determination under section 3156(a)(4)(B). There is no need for the Court to engage in "judge imagined abstraction—an idealized ordinary case of the crime." *Dimaya*, 138 S. Ct. at 1216 (citing *Johnson*, 135 S. Ct. at 2557). Then, and only then, is when the due process concerns come into play.

Applying the conduct-based approach in this case, *i.e.*, looking at the defendant's "real world conduct," the Court concludes that the offenses in this case are acts of violence. The weight of the evidence shows Defendant travelled to Berkeley and Charlottesville to incite and participate and carry out a riot, and his actual commission of acts of violence are shown in photos and video.

Therefore, under either section 3156(a)(4)(A) or (B), the crimes of Riots and Conspiracy to Commit Riots qualifies as a crime of violence, entitling the government to a detention hearing.

### B. Serious Risk of Flight

Even if Riots and Conspiracy to Commit Riots did not qualify as "crimes of violence", the government would be entitled to a detention hearing "upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves . . . a serious risk that such person will flee." 18 U.S.C. § 3142(f)(2)(A). There is little authority outlining what the government or Court must put forth to trigger the hearing. A district court in the Western District of Virginia said it simply: "a detention hearing may be held if either the United States or the court *believes* there is a serious risk of flight." *United States v. Powers*, 318 F. Supp. 2d 339, 341 (W.D. Va. 2004) (emphasis added).

Section 3142(f) requires that the detention hearing be held "immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance."[1] Because of the immediacy with which the hearing should happen, the government or Court need only express their belief that the defendant poses a serious risk of flight for the hearing to commence.

The Court finds the government has shown that it believes Defendant poses a serious flight risk. The government proffered evidence that Defendant has traveled internationally to meet with white-supremacist groups, Defendant has international contacts stemming from that travel, and Defendant has no ties to the Western District of Virginia. Again, the belief that entitles the government to the detention hearing is a very low threshold. The fact that Defendant asked for a continuance in order to brief the issue does not raise the threshold to have the hearing.

Thus, the Court concludes that under either subsection of section 3142(f), the government is entitled to a detention hearing to determine whether there are conditions or a combination of conditions to reasonably assure the defendant's appearance in the Western District of Virginia and the safety of any individual or the community.

### II. ORDER OF DETENTION

A defendant may be detained pending trial if the Court finds that no condition or

---

[1] It should be noted that Defense Counsel requested a continuance of the detention hearing twice, and the Court found good cause to grant the requests.

6

combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. § 3142(e)(1). The Court is directed to consider (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). "The weight of the evidence is the least important of these factors . . . . The nature of the offense and evidence of guilt is relevant only in terms of the likelihood that the person will fail to appear or will pose a danger to the community." *United States v. Cardenas*, 784 F.2d 937, 939 (9th Cir. 1986). An order of detention "shall [not] be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j). During a detention hearing, a defendant "shall be afforded an opportunity to testify," and both parties may present witnesses, cross-examine witnesses, and "present information by proffer or otherwise." 18 U.S.C. § 3142(f).

At the October 15, 2018 detention hearing, Defendant argued that he could be released on a secured bond because he did not have a significant history of violence beyond his involvement in two 2017 demonstrations in Berkeley, California, and Charlottesville, Virginia. Defendant further argued that the 2017 acts of violence were largely excused based on self-defense or mutual combat. To support this proffer, Defense Counsel sought to email two videos to the Court to review after the hearing—a National Geographic documentary on the Charlottesville rally of unspecified length, and a 17-minute Facebook video of Defendant talking about his involvement in white-supremacist groups, posted by Defendant six months after the Charlottesville rally. Defense Counsel was not prepared to enter the videos as exhibits to be viewed during the hearing, but instead asked the Court to continue the hearing a third time so that the Court could watch the videos in chambers. The Court declined to do so, admonishing Defense Counsel that whatever evidence he wanted to present at the hearing should have been brought to the hearing in a presentable format. Additionally, there was no good cause to continue the hearing where the videos had been available to Defense Counsel with ample time to prepare them prior to the hearing.

7

Defendant then summarized the videos, explaining that the National Geographic documentary would show that Defendant and the group he was a part of were walking peacefully through Charlottesville when they were ambushed by counter-protestors, and therefore, any act of violence was in self-defense. He also explained that the Facebook video would show Defendant's joking manner with which he made the statements about his involvement with European white-supremacist groups, and therefore, the statements taken from that video and used by the government should not be taken as serious admissions.

Defendant highlighted the fact that weapons taken from his home (a machete, knife with Nazi insignia, asp-type baton, and improvised hand-held devices) were either legally possessed or intended for use as skateboarding or work-related tools. Regarding Defendant's potential as a flight risk, Defendant argued that his passport had been voluntarily surrendered to Pretrial Services and that his recent international travel was lawfully conducted. Additionally, Defendant highlighted his ties to the Northern District of California community, including that he had a job and was in his last year of study at San Francisco State University.

The government argued Defendant should be detained because he posed a risk of danger to the community and a serious risk of flight. Regarding Defendant's danger to the community, the government submitted eleven photographic exhibits as evidence during the hearing. These exhibits captured aspects of Defendant's participation in a "tiki torch" march in Charlottesville on August 11, 2017 (Gov't Exs. 1 & 2), his participation in a "Unite The Right" rally the next day in the same city (Gov't Exs. 3-7), and the various alleged weapons taken from his home and vehicle on the day of his arrest (Gov't Exs. 8-11). Significantly, the photographs showed Defendant personally engaging in acts of violence, including swinging a torch as an apparent weapon (Gov't Ex. 2) and head-butting a female counter-protester in an apparently offensive attack, resulting in injuries to her (Gov't Exs. 5-7).

Regarding this latter incident, the Court specifically rejected Defendant's assertion that at the time of this head-butt, his hands were restrained behind him and that he was acting in self-defense. Clear photographic proof directly contradicts this assertion; Government Exhibits 5 and 6 showed Defendant with his hands unrestrained and grabbing the female counter-protester with

the aid of a co-defendant, the alleged leader of Rise Above Movement ("RAM"). Defendant responded that he was referring to other incidents of violence during the Charlottesville rally. The Court further rejected the assertion that the improvised hand-held devices referenced above (Gov't Ex. 11)—including a short section of pipe with a long metal screw inserted and an apparent razor blade encased in another short section of pipe—were possessed by Defendant for legitimate purposes.

### A. Risk of Flight

The government must prove by a preponderance of the evidence that the defendant is a risk of flight. *Cardenas*, 784 F.2d at 939.

First, as to the nature and circumstances of the offense charged, Defendant traveled to Berkeley, California, and Charlottesville, Virginia, from his home in Clayton, California, to participate in RAM rallies. The indictment out of the Western District of Virginia also asserts that Defendant and his co-defendants each travelled to Huntington Beach, California, to participate in another RAM rally. (W.D. Va. Indictment at 4.) While this additional event and travel is concerning to the Court, at the hearing the government only proffered that Defendant participated in the rallies at Berkeley, California, and Charlottesville, Virginia. The government also proffered, through Defendant's own admissions in his Facebook video, that he traveled to Europe to meet with leaders of two white-supremacist groups—the Ulster Aryan Alliance and the Scottish National Resistance. The fact that Defendant was willing to travel within California, across the country from California to Virginia, and to Europe weighs in favor of detention due to risk of flight.

Second, the weight of the evidence is strong, and Defendant faces up to five years in prison if he is convicted. Although the least important factor, it weighs in favor of detention.

Third, as to the history and characteristics of Defendant, the Court considers certain factors, including Defendant's character, family ties, employment, financial resources, length of residence in the community, and community ties. Defendant has extensive ties to the Northern District of California community, as he has lived in the District most of his life—the only exceptions being that he was born in Bakersfield, California, and he studied abroad in the fall of

9

2014 for three months as part of his San Francisco State University education. Both of his parents and much of his family reside in the District and state. Defendant is currently a senior at San Francisco State University, and up to the time he was arrested, had a job with Go Runner, a San Francisco-based delivery company.

Normally, these Northern District of California community ties weigh in favor of release. Here, however, no proceedings beyond this detention hearing will take place in the Northern District of California; instead, all future proceedings will be held in the Western District of Virginia. Defendant has no ties to the Western District of Virginia, other than his participation the Charlottesville rally. Thus, this factor weighs in favor of detention.

Fourth, Defendant's travel history weighs in favor of detention. In a relatively short period of time, Defendant took three trips to Europe: (1) from September 6, 2014 to December 6, 2014, Defendant studied abroad in Europe; (2) from September 20, 2016 to October 10, 2016, Defendant traveled through Iceland, Paris, Budapest, Prague, and Dublin; and (3) from July 19, 2017 to July 30, 2017, he traveled through Iceland, Dublin, Belfast, Edinburgh, Liverpool, and Manchester. During these trips, Defendant made contacts with people in Europe who he returned to visit, and admittedly keeps in contact with them via social media, including a woman who he may or may not have married in the Czech Republic during his study abroad. Defendant's international contacts heightens his risk of flight.

Finally, the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release is great. Even with strict monitoring of Defendant's movements and heavy restrictions placed on Defendant's internet use, the internet, which Defendant used to orchestrate his interactions domestically with RAM and internationally with other white-supremacist group leaders is so ubiquitous and near impossible to restrict to the extent that would be necessary in this situation. Defendant's use of the internet, if released, could lead to his flight through coordination with other RAM associates or his international contacts. The risk is too high in a case that involves the internet to the extent that this case does, and in a case that would involve Defendant traveling between the Northern District of California and the Western District of Virginia if Defendant were released. Defendant's access to the internet would be near

impossible to restrict in his travels. This factor weighs in favor of detention.

The government has sufficiently supported their contention by a preponderance of the evidence that Defendant is a serious risk of flight. The Court finds that Defendant poses a risk of flight that no combination of release conditions can reasonably address.

**B.      Risk of Danger**

The government must prove by clear and convincing evidence that the defendant is a risk of danger to the community.   18 U.S.C. § 3142(f). The Court again addresses each factor laid out in section 3124(g) to assess the risk of danger posed by Defendant.

As to the nature and circumstances of the offense, Riots and Conspiracy to Commit Riots qualify as crimes of violence under 18 U.S.C. § 3156(a)(4), for the reasons stated above. Furthermore, the photographs produced by the government are clear and convincing evidence that Defendant acted violently, including Defendant head-butting a woman during the Charlottesville rally. The photographs also show that his hands were not being held behind his back at that time. Whether his hands were held behind his back at some other time, as Defendant argues, is beside the point. On this occasion, Defendant was observably on the offensive and acted violently. The fact that the charged offenses are crimes of violence and the fact that there is photographic evidence of him being affirmatively violent weigh in favor of detention.

As to the weight of the evidence against the person, the photographs offered by the government provide compelling evidence that Defendant is a risk of danger by the fact that he is photographed aggressively head-butting a woman in the face (Gov't Exs. 5 & 6), otherwise participating in the Charlottesville rally (Gov't Exs. 1-4), and by the fact that he was in possession of several weapons upon his arrest, including a machete (Gov't Ex. 8), a knife with the Nazi insignia (Gov't Ex. 9), an asp-type baton (Gov't Ex. 10), and two make-shift weapons in his car the Court finds could have no legitimate or licit purpose (Gov't Ex. 11). This factor weighs in favor of detention.

As to the history and characteristics of Defendant, the Court considers factors such as Defendant's character, physical and mental condition, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, and to

11

whether at the time of the current offense or arrest, Defendant was on probation or awaiting resolution of past offenses. Here, Pretrial Services reported that Defendant does not have a history of mental illness. Defendant does not have any criminal history, nor does he have a history of drug or alcohol abuse. Defendant's history weighs in favor of release of Defendant.

Defendant's character, on the other hand, causes the Court concern regarding his risk of danger. Defendant is admittedly actively involved in RAM and similarly minded groups. RAM openly identifies itself as "alt-right" and "nationalist" and its members and associates frequently post "photographs and videos of its adherents engaging in physical training and mixed martial arts (MMA) street-fighting techniques, along with references to their alt-right and nationalist beliefs and ideology." (W.D. Va. Indictment at ¶ 5.) RAM and its members and associates also openly express "anti-Semitic, racist, and white-supremacist views and promote violence against those they believe [hold] opposing political views." (*Id.* at ¶ 6.)

The fact that Defendant may or may not be a bona fide member of these groups is of no import to the Court when analyzed in connection with his actions. He has admittedly communicated with the alleged leader of RAM, one of the co-defendants, he has admittedly participated in at least two RAM rallies, and he has invested significant time and resources into being involved with RAM.[2] Defendant is also photographed in Government's Exhibit 3 posing with and holding a "Unite the Right" RAM banner as part of the Charlottesville rally (Defendant is second to the left in a full crouch behind the banner). It is illustrative that not only is Defendant posing with the banner but is positioned directly to the right of the alleged leader of RAM in the photograph. This photograph, along with the other admissions by Defendant and proffers by the

---

[2] It is highly relevant that Defendant flew into the Charlottesville, Virginia, airport from San Francisco, California, to participate in one of the rallies. Not only is this a long cross-country flight, but it could not have been a direct flight due to the small size of the Charlottesville airport. The flight would have required at a minimum one layover in one of six major connector airports—Atlanta, GA, Charlotte, NC, Chicago, IL (O'Hare), Philadelphia, PA, New York, NY (La Guardia), or Washington, D.C. (Dulles). Routes & Stops, CHO Airport, http://www.gocho.com/routes-stops/ (last visited Oct. 18, 2018). The mandatory layover(s) increased the time investment that Defendant was willing to make. Additionally, flights to smaller airports tend to be more expensive, increasing the financial investment that Defendant was making in furtherance of RAM. Whether or not he believed he would be reimbursed for the flight, it still required an upfront investment of hundreds of dollars in furtherance of RAM and its ideals.

government show Defendant as being highly involved in RAM, despite the contention by Defendant that he is not a "member" of the organization. Defendant's actions are more persuasive as evidence of his concerning character than are his words. His words and explanations, in opposition to the evidence, ring hallow.

Moreover, Defendant reported to FBI agents that he traveled internationally to Europe (on two occasions) to meet with other leaders of hate groups similar in nature to the mission of RAM. The fact that Defendant now claims that all his admissions regarding his association with European white-supremacist groups were made as a joke suggests to the Court that Defendant's character and judgment is concerning. Defendant's character weighs in favor of detention.

Finally, the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release is high. The danger to the community in this case is great due to the fact that Defendant and his co-defendants all used the internet to organize and promote the violent rallies. Defendant has admitted to using Instagram to communicate with the alleged leader of RAM and has used Facebook to post at least one video in support of RAM and similar organizations. Again, the fact that Defendant now claims that his admitted association with these groups was made in jest is of great concern to the Court regarding his truthfulness. This factor weighs in favor of detention.

Like the internet analysis for risk of flight above, there are no restrictions that would ensure Defendant's non-use of the internet for illicit purposes, such as communicating with members and associates of RAM, and promoting and encouraging more violent rallies, especially considering the travel that would be required of Defendant from California to Virginia. The kind of strict internet restrictions that would be required in this case to mitigate Defendant's risk of danger to the community by use of the internet are not practicable.

The government has presented clear and convincing evidence to show the violent nature and circumstances of the offense and the risk of danger that would be posed to the community by Defendant's release. This Court finds that Defendant poses a risk of danger to the community and that there is no combination of release conditions to reasonably address this risk.

13

## III. CONCLUSION

For the reasons stated above, the government was entitled to a detention hearing. The Court further finds no condition or combination of conditions that would reasonably assure the community's safety or Defendant's appearance as required, and ORDERS Defendant be detained. Defendant is further ordered removed to the Western District of Virginia for further proceedings. Defendant shall be transported and remain in the custody of the Attorney General or a designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or held in custody pending appeal. 18 U.S.C. § 3142(i)(2). Defendant must be afforded a reasonable opportunity to consult privately with counsel. 18 U.S.C. § 3142(i)(3). On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility must deliver Defendant to the United States marshal for a court appearance. 18 U.S.C. § 3142(i)(4). Any motion for revocation or amendment of this detention order must be filed with the court having original jurisdiction over this case—the Western District of Virginia, case assigned to Judge Norman K. Moon. 18 U.S.C. 3145(b).

**IT IS SO ORDERED.**

Dated: October 19, 2018

_____
KANDIS A. WESTMORE
United States Magistrate Judge